**UNITED STATES of America,
Plaintiff,**

v.

**PACIFIC SOUTHWEST AIRLINES, et al., Defendants.**

**No. 72-2901-DWW.**

United States District Court,
C. D. California.

May 8, 1973.

James J. Coyle, Joel Davidow, Ronald M. Friedman, Antitrust Div., Dept. of Justice, Los Angeles, Cal., for plaintiff.

Frank Rothman, Mariana R. Pfaelzer, George Miron, Wyman, Bautzer, Rothman & Kuchel, Beverly Hills, Cal., for defendant PSA.

John J. Hanson, J. Edd Stepp, Jr., Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant Air-California, Inc.

Mark T. Gates, Jr., Dietsch, Gates, Morris & Merrell, Los Angeles, Cal., for defendants.

John P. Mathis, J. Calvin Simpson, Donald C. Meaney, Public Utilities Comm., San Francisco, Cal., for intervenors.

### ORDER DENYING MOTION
### TO DISMISS

DAVID W. WILLIAMS, District Judge.

Pacific Southwest Airlines (PSA) and Air California (AirCal) are private corporations competing for customers and routes in the commercial airline business in California. Westgate-California Corp. (Westgate) owns approximately 81 percent of the outstanding common stock of AirCal.

Westgate and PSA entered into a contract on July 6, 1972, providing for PSA to buy all of Westgate's common stock interest in AirCal. On July 7, 1972, defendants filed a joint application with the California Public Utilities Commission (PUC) for permission to consummate the merger. The application was filed pursuant to §§ 2757 and 2758 of the California Public Utilities Code which requires PUC authorization as one of the conditions precedent to any passenger air carrier acquisition subject to the jurisdiction of the PUC.

On December 5, 1972, after hearings before the PUC ended but prior to the PUC's approval, the United States filed a complaint charging that the pending acquisition by PSA of a controlling stock interest in defendant AirCal would violate § 7 of the Clayton Act, 15 U.S.C. § 18.[1] The Government alleges *inter*

---

1. 15 U.S.C. § 18 (Clayton § 7): "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the FTC shall acquire the whole or any part of the assets of another corporation engaged also in commerce, in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the FTC shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the

*alia* that the acquisition would give PSA a dominant share of air passenger transportation within California. PSA and AirCal combined would have 81% of all air passenger transportation in the California air corridor market; 81% of the Los Angeles Metropolitan area to San Francisco metropolitan area air corridor submarket; and from 89% to 100% in four-paired city airport submarkets. This extreme concentration of air transportation on routes within California, the Government argues, is a prima facie violation of § 7 of the Clayton Act. United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966).

On February 23, 1973, the PUC granted conditional authorization for PSA's proposed acquisition of AirCal. This authorization is limited to "expire one hundred and eighty days after the effective date of this order, unless extended by further order of the Commission."

In deciding whether to approve the merger of the two companies, the PUC held a hearing and made a determination regarding whether the proposed transfer would be in the "public interest." California regulates passenger air carriers operating between points in California pursuant to Cal.Pub.Util.Code §§ 2739–44 (West Supp.1972). A passenger air carrier is defined as any person or corporation owning, controlling, operating, or managing aircraft as a common carrier of passengers for compensation between points within California. The above statute specifically *excludes* from its provisions passenger air carriers within California who furnish service pursuant to a current certificate of public convenience and necessity issued by the federal government ("interstate carriers"). PUC regulations go only to economic, *not* air safety matters —the latter is the exclusive province of the Federal Aviation Agency pursuant to 49 U.S.C. § 1421 et seq.

The PUC must approve one intrastate carrier's acquisition of control over another (§ 2757). The criteria to be applied by the PUC includes under § 2758: "The commission shall not authorize, however, any consolidation, merger, purchase, lease, operating contract, or acquisition of control which would result in creating a monopoly or monopolies and thereby restrain competition. . . ."

Defendants have moved to dismiss this action on two alternative grounds: 1) This Court is without jurisdiction to prohibit the consummation of the proposed merger, which has been approved by the California PUC, a state regulatory body acting within the scope of its valid police power; or, in the alternative, 2) Assuming *arguendo*, that the merger is subject to regulation by the Civil Aeronautics Board (CAB), then the CAB, and not this Court, is the proper forum to entertain proceedings regarding the proposed acquisition.

■ Authority for the first ground for dismissal, defendants assert, may be found in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942) and subsequent cases relying on the rationale of that case. This Court concludes that *Parker* and its progeny are not applicable to our facts and denies this ground for dismissal.

As noted previously, PUC authorization is a condition precedent to any passenger air carrier acquisition subject to the jurisdiction of that agency. The PUC did not, however, encourage, much less direct, that this merger take place, nor did it direct that upon approval the merger must be consummated—it has no statutory power to command the execution of the merger. The foregoing distinguishes *Parker* and subsequent cases which have adopted *Parker* from the facts presented to this Court.

In *Parker* the Supreme Court held that the California raisin marketing program conducted by a state commis-

country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies

or otherwise, may be substantially to lessen competition, or to tend to create a monopoly."

sion was permissible under the antitrust laws. The Court assumed, without deciding, that the California program would have violated the Sherman Act if it were organized and made effective solely by virtue of a combination or conspiracy of private persons. The Court went on to say: "It is the *state which has created* the machinery for establishing the prorate program. Although the organization of a prorate is proposed by producers, and a prorate program, approved by the Commission, must also be approved by a referendum of producers, it is the state acting through the Commission, which *adopts the program* and which *enforces it with penal sanctions, in the execution of a governmental policy* . . . The state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." *Parker* at 352, 63 S.Ct. at 314 (emphasis added).

In summary, in Parker v. Brown, a state marketing scheme which included price-fixing combinations by producers was held immune from challenge under the Sherman Act on the ground that the act was intended to apply only to combinations of individuals or corporations and *not to combinations of which a state was the moving force. Parker* at 351 et seq., 63 S.Ct. 307.

The Court used language indicative of desiring the Sherman Act *not* to interfere with state legislature *directed, commanded,* or *imposed* action. *Parker* at 350–352, 63 S.Ct. 307. Certainly it is difficult to suggest that PSA and Air California have been directed or commanded to merge by the PUC in light of the "public interest" in such a merger. Going one step further, while PUC authorization is necessary for the merger to take place, once it approves, the PUC cannot order such a merger. It merely stamps the merger transaction with approval and stands aside leaving it to the parties to execute the plan.

Defendants heavily rely on Washington Gas Light Co. v. Va. Electric and Power Co., 438 F.2d 248 (4th Cir. 1971); Gas Light Co. of Columbus v. Ga. Power Co., 440 F.2d 1135 (5th Cir. 1971), cert. den. 404 U.S. 1062, 92 S.Ct. 732, 30 L.Ed.2d 750 (1972), reh. den., 405 U.S. 969, 92 S.Ct. 1162, 31 L.Ed.2d 244 (1972), and Allstate Insurance Co. v. Lanier, 361 F.2d 870 (4th Cir. 1966).

Both Washington Gas Light and Gas Light Co. of Columbus are distinguishable from our facts and both were criticized in International T & T Corp. v. General Telephone and Electric Corp., 351 F. Supp. 1153 (D.Hawaii 1972) as "an unwarranted hyperextension of *Parker*." ITT at 1203, Note 129. The applicability of the *Allstate Insurance Co.* decision is qualified in that it turns on the special status of the insurance industry.

Involved in *Washington Gas Light* was VEPCO, a state regulated utility supplying electricity to areas of Virginia also served by plaintiff gas utility, Washington Gas Light Co. In 1963 VEPCO began the first in a series of all-electric house plans designed to make it more attractive for a home builder to install electric appliances in their new homes to the exclusion of the competing utility—natural gas. The Virginia State Legislature in 1966 by statutory amendment specifically required Virginia's utility regulatory body to investigate the "promotional allowances and practices of public utilities and to take such action as such investigation may indicate to be in the public interest." Ultimately the regulatory authority approved (by its silence) a VEPCO plan that gave credit to builders going "all electric" sufficient to cover the entire cost of installing the necessary underground electricity lines. By virtue of this credit VEPCO made significant inroads into areas previously dominated by the use of natural gas—plaintiff's domain.

Citing language in *Parker*, 317 U.S. at 351, 63 S.Ct. at 313: "We find nothing in the language of the Sherman Act or in its history which suggests that its

purpose was to restrain a state or its officers or agents from activities *directed by its legislature . . . ." Washington Gas Light*, 438 F.2d at 251 (emphasis added).

The Virginia regulatory authority was deemed a proper state agency to qualify under *Parker* because it had the power, inter alia, to prescribe utility rates and to regulate other non-specified corporate utility activities under Va.Code Ann. § 56–238: "The Commission, either upon complaint or on its own motion, may suspend the enforcement of any or all of the proposed rates . . . investigate the reasonableness or justice of the proposed rates . . . and thereupon fix and order substituted therefor such rates . . . as shall be just and reasonable."

There is language in *Washington Gas Light Co.* that is supportive of defendant's position but does not conflict with my reading of *Parker*: "To find shelter under Parker, the acts complained of must be the result of state action, either by state officials or private individuals 'under the active supervision' of the state (cite omitted), although proposals may originate privately if their execution depends on state regulation or actual state implementation." This rather expansive language is immediately followed by a qualifying quote from Asheville Tobacco Board of Trade, Inc. v. FTC, 263 F.2d 502, 509 (4th Cir. 1959): "The teaching of Parker v. Brown is that the antitrust laws are directed against individual and not state action. *When a state has a public policy against free competition in an industry important to it, the state may regulate that industry in order to control or, in a proper case, to eliminate competition therein . . . ." Washington Gas Light*, 438 F.2d at 251 (emphasis added).

In Allstate Insurance Co. v. Lanier, supra, the Court held that 15 U.S.C. §§ 1011–1015 exempted rate fixing by insurance bureaus from the federal antitrust laws—i. e., the Court found explicit congressional intent that a state created and supervised rating bureau *should not be subject to the antitrust laws.* Congress has exempted certain transactions from the antitrust laws; none of the exemptions include state sanctioned airline mergers.[2]

*Gas Light of Columbus* involved rate schedules supplied by a state encouraged private monopoly which were *ordered into effect* upon review by the appropriate commission. "Though the rates and practices originated with the regulated utility, Georgia Power, the facts make it plain that they emerged from the Commission *as products of the Commission." Gas Light of Columbus*, 440 F.2d at 1140 (emphasis added). Certainly it would be difficult to argue that the present merger is a "product" of the PUC by virtue of its ruling that the merger was in the public interest.

In *Parker, Washington Gas Light* and in *Gas Light of Columbus*, unlike our facts, state commission approval *compelled* action, did not merely condone it; and in all three cases state *monopolies,* not *competition* was specifically being encouraged.

The assertion that the underlying rationale of *Parker* is that state created or encouraged monopolies are not intended by Congress to be subject to the antitrust laws is suggested in George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25 (1st Cir. 1970): "Our reading of *Parker* convinces us that valid government action confers antitrust immunity only when government determines that competition is not the *summum bonum* in a particular field and deliberately attempts to provide an

---

**2.** Some examples where Congress has expressly exempted certain transactions from the antitrust laws are the following: 15 U.S.C. § 1012(b) exempts state laws regulating the business of insurance; 15 U.S.C. § 1 exempts state approved contracts or agreements prescribing minimum prices for the resale of certain commodities; 15 U.S.C. § 45(a) exempts additional agreements prescribing minimum prices; and 7 U.S.C. § 291 exempts capital stock of agricultural cooperatives.

alternate form of public regulations." *Whitten* at 30. Under § 2758 of the California Public Utilities Code, the PUC is prohibited from authorizing mergers that would result in a monopoly.

Equally strong language is found in Hecht v. Pro-Football, 144 U.S.App.D.C. 56, 444 F.2d 931 (1971). In *Hecht* the armory board was found *not* beyond the pale of the Sherman Act, thus the lease between professional football team owners and the board which prohibited the use of the stadium in question by any professional football team other than the owner's team for 30 years must be tested against United States antitrust legislation. "We suggest that it may be inaccurate and confusing to speak of 'valid governmental action which is immune from application of the antitrust laws.' Rather, the proper inquiry would seem to be to what extent Congress has knowingly adopted a policy contrary to or inconsistent with the previously established antitrust laws, or where state action is concerned . . . the inquiry should be to what extent is the state action permissible as not contravening the federal antitrust laws, which in our federal system constitute overriding legislation under the federal commerce power." *Hecht* at 935.

In *International T & T* (ITT), supra, the latest case in the 9th Circuit dealing with the Parker v. Brown doctrine, ITT maintained that General Telephone and Electric's (GTE) acquisition, over a nine year period, of three companies, manufacturers and distributors of telecommunications equipment, created a vertically integrated telephone company. GTE's telephone operating companies bought almost all of their transmission equipment, switching systems, apparatus and other telephone communications equipment from GTE's own manufacturing subsidiaries. In addition, GTE began acquiring telephone operating companies, thus independent manufacturers of telecommunications equipment were foreclosed from selling telephone equipment and supplies to GTE's operating companies.

In a well-reasoned, lengthy opinion Judge Pence reiterated the thesis underlying my denial of this motion to dismiss: "Unless it is inherent in the statutory scheme or program that antitrust restraints flowing from an 'approved' merger were both anticipated and intended by the state to result therefrom and nevertheless, were intended to be protected from antitrust attack *as a necessary concomitant of the implementation of the state's scheme or program, and the state's regulatory policy is consistent with federal national policy,* then approval of such a merger . . . by a state regulatory agency does not cloak such merger with *Parker* immunity." *ITT*, 351 F.Supp. at 1202. (emphasis added). In *ITT,* not only had the proposed merger not been suggested as an "[implementation] of some necessary intrastate regulatory objective" (at 1202) but, the Court concluded: "As a policy matter a state may conclude that it is an economic necessity that certain public services be supplied to its residents through a privately owned monopoly. However, there is nothing in the record or the statutes of the several states here considered to indicate that any of the several states intended that their regulations were expected to bring about any restraint of trade other than through a state given monopoly of local or state *telephone service.* Nor is there any indication that Congress has ever intended to give them any further immunity power."

On the issue of the effect of the PUC approval of the proposed merger, the California Supreme Court, as recently as 1971, addressed itself to this problem. While recognizing that the PUC *must* in weighing public interest factors, scrutinize the effect of transactions on competition, Justice Sullivan speaking for the Court maintained that ". . . by considering antitrust issues, the Commission merely carries out its legislative mandate to determine whether the public

convenience and necessity require a proposed development. *That task does not impinge upon the jurisdiction of the federal courts in federal antitrust cases.* . . . Its consideration of antitrust problems is for purposes quite different from those of the courts; it does not usurp their function." Northern California Power Agency v. Public Utility Commission, 5 Cal.3d 370, 96 Cal. Rptr. 18, 486 P.2d 1218 (1971). While this is not binding on this Court the above language certainly militates against the proposition that because the PUC has approved the PSA/Air California merger (after considering anticompetitive effects) we are without jurisdiction to consider a challenge to the merger by the Government on the issue of alleged Clayton § 7 violations.

## II.

█ Defendants' second ground for dismissal assumes for the sake of this motion only that PSA and/or Air California is subject to the jurisdiction of the CAB: thus, if one or both airlines is subject to the CAB authority then their merger is also subject to CAB approval—exclusively.

In short, the CAB has refused to regulate PSA or Air California by granting exemptions from the Federal Aviation Act 49 U.S.C. § 1301 et seq. The latest exemption, however, states that: "It should be noted that we do not consider an exemption granted pursuant to the proviso of subsection 408(a)(5) as an order within the meaning of § 414 of the Act, and we do not here intend to confer any antitrust immunity (cite omitted). Order Granting Exemption, CAB Order No. 24734 (Jan. 24, 1973).

Deciding not to dismiss this action based on the alleged exclusive jurisdiction of the CAB does not conflict with Pan American World Airways Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) or, more recently, Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). Implicit in these two Supreme Court opinions is the

fact that the CAB had exercised jurisdiction over the airlines involved. Here, as noted above, the CAB has refused jurisdiction by granting exemptions for certain activities which would, without the exemptions, bringing PSA and Air California into the CAB bailiwick as engaging in interstate air transportation within the meaning of 49 U.S.C. § 401(21).

For the foregoing reasons defendants' motion to dismiss is denied.