John WOOLEN, Jack T. Stephens, and John D. Campisi, Individually and as Class Action Plaintiffs,

v.

SURTRAN TAXICABS, INC., City of Dallas, Texas, City of Fort Worth, Texas, City of Irving, Texas, and City of Grapevine, Texas.

Civ. A. No. CA–3–78–1609–G.

United States District Court, N. D. Texas, Dallas Division.

Nov. 29, 1978.

Tom Thomas and Robert F. Maris of Kolodey & Thomas, Dallas, Tex., for plaintiffs.

B. Thomas McElroy of White, McElroy & White, Dallas, Tex., for Surtran Taxicabs, Inc.

Lee E. Holt, City Atty., Joseph G. Werner, Kent S. Hofmeister, Asst. City Attys., Dallas, Tex., for City of Dallas, Tex.

Arthur Petersen, City Atty., David Williams, Jim Lollar, Asst. City Attys., Richard Henderson, City of Fort Worth, Fort Worth, Tex., for City of Fort Worth, Tex.

Don J. Rorschach, City Atty., City of Irving, Irving, Tex., for City of Irving, Tex.

John F. Boyle, Jr., of Hutchison, Price, Boyle & Brooks, Dallas, Tex., for City of Grapevine, Tex.

## MEMORANDUM ORDER AND OPINION

PATRICK E. HIGGINBOTHAM, District Judge.

### Nature of the Case

Before the opening of the Dallas-Fort Worth Regional Airport in 1974, the cities of Dallas and Fort Worth, as owners of the airport, established by contract the D/FW Surtran System for the purpose of providing ground transportation for the airport. The system, apparently a joint venture, then implemented its responsibility to provide taxi service to the airport by accepting competitive bids for the privilege of picking up passengers at the airport. The winning bid was submitted jointly by Yellow Cab of Dallas, Inc. and the Fort Worth Cab and Baggage Company. These corporations formed Surtran Taxicabs, Inc., which, on August 27, 1973, contracted with the Surtran System for the privilege of picking up taxicab passengers at the airport for transport to points in the ten counties surrounding the airport. The contract set the rates to be charged, and provided that the System would be paid 75¢ per trip plus 50% of all profits above a 5% operating profit.

Dallas and Fort Worth adopted ordinances setting forth a Code of Rules and Regulations for the airport, and the code was later adopted by the cities of Grapevine and Irving. This code provides, inter alia, that only holders of permits issued by the airport board may provide ground transportation from the airport. As Surtran Taxicabs, Inc. holds the sole permit for soliciting taxicab passengers at the airport, the effect of the Code and of the August 27, 1973,

contract is that only Surtran Taxicabs, Inc. may pick up taxi passengers at the airport.

This suit challenges the arrangement among the cities of Dallas and Fort Worth and Surtran Taxicabs as a violation of the Sherman Act, 15 U.S.C. § 1 et seq. Plaintiffs seek to represent a class composed of taxicab drivers who hold, or have held since January 13, 1974 (the date of the opening of the airport) permits to operate taxicabs issued by municipalities within the ten county region surrounding the airport. Named as defendants are the cities of Dallas, Fort Worth, Irving, and Grapevine (the cities of Coppell and Euless, named as defendants in the original complaint, have been dismissed), and Surtran Taxicabs, Inc.

The complaint alleges that the cities and Surtran have participated, and continue to participate in a combination in restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976); and that they have created a monopoly in violation of section 2 of the Act, 15 U.S.C. § 2 (1976).[1] The cab drivers seek both injunctive relief and treble damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15 (1976).

The cities and Surtran have filed motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Their contentions will be separately considered.

### Discussion

Legal challenge is not new to the transportation arrangement at issue here, see, e. g., Continental Bus System v. City of Dallas, 386 F.Supp. 359 (N.D.Tex.1974); Airport Coach Service v. Fort Worth, 518 S.W.2d 566 (Tex.Civ.App.—Tyler 1975, writ ref'd n. r. e.), or to others like it. See, e. g., Walker v. Houston, No. 73–H–648 (S.D.Tex. November 29, 1976); Park 'N Fly of Texas, Inc. v. Houston, 327 F.Supp. 910 (S.D.Texas 1971); Bellew v. Houston, 456 S.W.2d 185 (Tex.Civ.App.—Houston [1st Dist.] 1970, writ ref'd n. r. e.). This history of this airport and its development has been de-

---

1. Because the thrust of this Memorandum is whether the antitrust laws are applicable, it does not attempt inquiry separate from § 1 into the merits of the § 2 claim.

scribed in other cases. *See, City of Dallas, Texas v. Southwest Airlines Co.,* 371 F.Supp. 1015 (N.D.Tex.1973) and *Continental Bus System, Inc. v. City of Dallas, supra.* But the landscape has been so changed by recent decisions of the United States Supreme Court that the light of these decisions now fails to illuminate the corners of the presented legal issues.

## I. *The State Action Exemption.*

Defendants argue that the antitrust laws have no application to the activities at issue here because of the operation of the so-called state action exemption of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). That case held that certain anticompetitive activities imposed by the state "as sovereign" are not subject to the federal antitrust laws. A few short years ago this case might have succumbed at this stage to the force of *Parker.* But if recent decisions of the Supreme Court have not narrowed the scope of its state action exemption they at least have recast the analytical construct for resolution of *Parker* issues.

### A. *Lafayette v. Louisiana Power & Light.*

The starting point for analysis of the applicability of the federal antitrust laws to activity by state and local government must now be the Supreme Court decision in *Lafayette v. Louisiana Power & Light,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). In that case the Supreme Court refused to extend antitrust immunity to cities that were alleged to have committed antitrust violations in the operation of electric utility systems.

The cities of Lafayette and Plaquemine were authorized by Louisiana law to operate electric utility systems both within and beyond their city limits. The cities sued LP&L for alleged anticompetitive practices, and LP&L counterclaimed, alleging various antitrust offenses including illegal tying arrangements. The cities then moved to dismiss the counterclaim on the ground that the activity fell within the protection of *Parker v. Brown.*

The district court granted the motion, but the Fifth Circuit reversed and remanded the case for further proceedings to determine whether the anticompetitive activity alleged was of a type contemplated by the state legislature. 535 F.2d 431 (5th Cir. 1976). The Supreme Court affirmed the decision of the Fifth Circuit.

In the only part of the opinion that received the support of a majority of justices, Justice Brennan considered whether, wholly apart from their relationships with the states, municipalities should be shielded from the operation of the antitrust laws. He reasoned that the state action exemption from the antitrust laws has its roots in federalism; that is, the *Parker* decision was the result of a balancing of antitrust policy against the principles of a dual system of government under which the states are sovereign except insofar as Congress may constitutionally limit their authority. Government activity should be exempt from the antitrust laws, then, only if their application would "severely impinge" upon the system of federalism. Justice Brennan rejected the cities' argument that federal antitrust law should be generally inapplicable to municipalities by virtue of the fact that municipal activities are intended to serve the public weal. Brennan noted that municipalities might make shortsighted economic decisions that could benefit their constituents but disserve others, and might cause severe economic hardship outside of the local government boundaries. Furthermore, he argued, municipalities do not occupy the same status in the system of federalism as the states; application of antitrust sanctions to their activities would not be nearly so injurious to federalism as would their application to activities of a state. For these reasons, Justice Brennan (joined by a majority of the court) concluded that, viewed in isolation from their relationship with the state, the activities of municipalities do not merit exemption from the antitrust laws.

In Part II of his opinion, which was joined by only three other justices, Justice

Brennan considered the impact of the relationship between the municipality and the state upon the question of local government amenability to antitrust actions. He concluded that municipalities should be shielded from antitrust attack only when their actions reflect state policy to displace competition.

> We therefore conclude that the *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service. 435 U.S. at 413, 98 S.Ct. at 1137.

Under this view, a state retains broad power to shield activities from antitrust attack. That conclusion apparently stems from deference to the system of federalism, a policy that outweighs the federal policies expressed in the antitrust laws. In this regard, the *Parker* doctrine is not significantly upset by the decision in *Lafayette*. At the same time, though, Justice Brennan's conclusion sharply limits the antitrust immunity of municipalities and other state subdivisions. Such entities are within the exemption only if the state law under which they act expresses a "state policy to displace competition with regulation or monopoly public service." In Part III of his opinion, Justice Brennan explained this new standard:

> This does not mean, however, that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense . . . [A]n adequate state mandate for anticompetitive activities . . . exists when it is found "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." (citation deleted). 435 U.S., at 419, 98 S.Ct. at 1138.

Justice Burger, concurring in Part I of the Court's opinion and in the judgment, would have narrowed the *Parker* exemption even further. While agreeing with the plurality that "the threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the state acting as sovereign," 435 U.S., at 425, 98 S.Ct. at 1143, Justice Burger would have added the requirement that the implied exemption be "necessary in order to make the regulatory Act work, and even then only to the minimum extent necessary." This standard would, in effect, limit state power to bestow antitrust exemption upon the actors in the fields it chooses to regulate.

What emerges from the plurality and concurring opinions, then, are two rules. First, municipalities are not exempt from the antitrust laws solely by virtue of their status as governmental entities. Second, the activities of municipalities and others are exempt from the antitrust laws only if undertaken pursuant to acts of the state "as sovereign" that evince a state policy "to displace competition with regulation or monopoly public service."

Preparatory to exploration of the question of antitrust immunity for private parties, one other recent decision of the Supreme Court ought to be reviewed because it is closely connected with the principles announced in *Lafayette*.

*Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) involved an antitrust attack on a minimum fee schedule promulgated and enforced by the Virginia State Bar. The Supreme Court rejected the lawyers' claim of exemption from the antitrust laws, finding insufficient state action to bring the *Parker* doctrine into play. The court reasoned that the state had not required the fee schedule, and so the state action exemption did not apply. The implication, of course, was that the state could have legitimately required such a fee schedule; in that sense the core of *Parker* was left intact.

Finally, in one of the first lower court decisions to follow *Lafayette*, the U. S. District Court in Austin relied upon *Lafayette* in concluding that the acts of the Texas State Board of Public Accountancy were

not exempt from antitrust attack, because the legislation from which it drew its authority was cast in permissive and not mandatory language. *United States v. Texas State Board of Public Accountancy*, No. A–76–CA–219 (W.D.Tex. May 5, 1978).

### B. *Cantor v. Detroit Edison Co.*

With regard to the availability of antitrust immunity to a private party, the primary source is the Supreme Court decision in *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). In that case, the Court faced, but did not fully resolve, the question of whether a private party may claim the state action exemption of *Parker v. Brown*. The case involved an antitrust attack on an allegedly anticompetitive light bulb distribution program conducted by a regulated public utility, a program sanctioned and, in a sense, required by the Michigan Public Utilities Commission (the practice expressed in a tariff could not have been terminated without commission approval).

In a divided opinion, the Court held the practice not exempt from antitrust attack because the decision to implement the policy was not imposed unilaterally upon the corporation by the state, and because the program was not essential to the success of the state's regulatory program.

Four justices argued that the state action exemption of *Parker* was not available to private parties, fearing that a rule permitting such immunity would give too much power to state legislatures to authorize exemptions from the antitrust laws. At least five justices, however, agreed that there may be situations where, because a private party has acted in obedience to unilateral state action, it would be unjust to impose antitrust liability. The upshot of this part of the opinion is that while the state action exemption of *Parker v. Brown* may not be available to a private party, there may nonetheless be cases where antitrust liability will not be imposed upon a private party

who acts in response to a unilateral decision by the state. The court held that no such situation was presented by the case before it. The light bulb exchange program had been initiated by the defendant, and was not compelled by the Public Utilities Commission. Consequently, the Court found no unfairness in holding the defendant "responsible for the consequences of his decision" and in subjecting the corporation to antitrust liability.

The other part of Justice Stevens' opinion that received majority support held that state-sanctioned activity is immune from antitrust attack where it is essential to the success of the state's regulatory goals. The mere fact that a state regulatory agency has acquiesced in certain activities, however, does not clothe those activities with immunity.

The Court has consistently refused to find that regulation gave rise to an implied exemption without first determining that exemption was necessary in order to make the regulatory Act work, "and even then only to the minimum extent necessary." 428 U.S., at 597, 96 S.Ct. at 3121.

The Court found that Detroit Edison's light bulb exchange program did not meet this test, and hence was not exempt from the antitrust laws.

Justice Blackmun, concurring in the judgment, urged that the court apply a "rule of reason" in determining whether challenged activity falls within the ambit of the state action exemption. The harm produced by state-sanctioned activity, he argued, should be weighed against the benefits. That analysis is reminiscent of a substantive due process approach, to some failing to approximate a neutral standard, precisely what the court in *Parker v. Brown* was seeking to avoid.

In sum, *Cantor* holds, though with less than perfect clarity,[2] that a private party may claim immunity from antitrust liability only when the acts complained of are essen-

---

**2.** If a studied vagueness, its inclusion is not necessarily unwise. The development of a judicial consensus for government goals in a regu-

lated economy may need academic jousting and case-by-case fleshing, both nourished by the vague phrase.

tial to the state's regulatory scheme, or when the acts result from decisions in which the state has played such a dominant role that it would be unjust to impose antitrust liability on the private party.

C. *The Defendant Cities' Claim of Exemption.*

In order for the cities of Dallas, Fort Worth, Grapevine, and Irving to succeed in their claim of exemption, they must show, according to *Lafayette,* that their implementation of the taxicab service at the airport was "pursuant to state policy to displace competition with regulation or monopoly public service." The cities have pointed to two state laws that, they argue, evince such a policy.

The cities point first to the Municipal Airport Act, Tex.Civ.Stats.Ann. arts. 46d–1–46d–22 (Vernon 1969). The act authorizes municipalities to establish and operate airports both within and without their boundaries. More particularly, article 46d–4 provides:

(a) In operating an airport . . . such municipality may . . . enter into contracts . . . and other arrangements for a term not exceeding forty (40) years with any persons:

.      .      .      .      .

(2) conferring the privilege of supplying goods, commodities, things, services or facilities at such airport . . . In each case the municipality may establish the terms and conditions and fix the charges, rentals or fees for the privileges or services . . .

Read in isolation, this statute is ambiguous, at least insofar as the legislative intent is concerned. It is possible to conclude that the legislature intended by this law to displace competition at municipally operated airports. But this article must be read in conjunction with article 46d–7, which provides:

(b) No ordinance, resolution, rule, regulation or order adopted by a municipality pursuant to this Act shall be in-

consistent with, or contrary to, any Act of the Congress of the United States or laws of this State, or to any regulations promulgated or standards established pursuant thereto.

The conclusion is all but inescapable that the Texas legislature did not contemplate the implementation of anticompetitive activities by municipalities in their operation of airports. While it is conceivable that this latter provision was not intended to encompass the antitrust laws, its plain meaning cannot be ignored.

The defendant cities also point to the Texas law that specifies the powers of cities that have adopted a home rule charter. Tex.Civ.Stat.Ann. art. 1175 (Vernon 1963). That article provides, in pertinent part:

Cities adopting the charter or amendment hereunder shall have full power of local self-government, and among the other powers  .    .    .

12. To prohibit the use of any street . . . of the city by any . . . character of public utility without first obtaining the consent of the governing authorities . . . To determine, fix, and regulate the charges, fares, or rates of any person, firm, or corporation enjoying or that may enjoy the franchise . . . and to prescribe the type of person to be furnished by such person

.      .      .      .      .

21. To regulate, license and fix the charges or fares made by any person owning, operating or controlling any vehicle of any character used for the carrying of passengers for hire.

It is difficult to find in these provisions any evidence of state policy to displace competition. At most, they seem to contemplate minimum regulation of public transportation by home rule cities with a view toward traffic safety. Moreover, the statute merely authorizes, it does not require. If these provisions are viewed as evincing a state policy to implement the type of activity complained of here, then they would afford almost blanket exemption from anti-

trust laws for the activities of municipalities with regard to transportation. That is precisely the result that the Supreme Court sought to avoid in *Lafayette*. While the court there did not require specific, detailed authorization for anticompetitive activity from the state legislature, it did require greater evidence of state policy than can be gleaned from article 1175.

Finally, the city of Dallas argues that antitrust immunity should flow from the fact that the Texas Constitution authorizes cities of over 5,000 inhabitants to adopt home rule charters. The argument is that, since the powers of such cities flow directly from the state constitution, these cities should be regarded as sovereigns, and their activities should be regarded as equivalent to those of the state itself and hence exempt from the antitrust laws under the *Parker* doctrine.

This argument stumbles upon the reasoning of Justice Brennan in Part I of his opinion in *Lafayette*. However "sovereign" home rule cities in Texas may be, they nonetheless carry the status of municipalities so far as federalism is concerned. A majority of the court in *Lafayette* found that, with respect to the activities of municipalities (viewed in isolation from their relationship with the state), the policies of federalism simply do not outweigh the federal policies expressed in the antitrust laws; hence their activities are not automatically exempt from the operation of the antitrust laws.

▉ The defendant cities, therefore, have failed to show that their establishment and enforcement of taxicab service at the airport was pursuant to a state policy to replace competition "with regulation or monopoly public service." For that reason they do not succeed in their claim that these activities are exempt from antitrust attack.

### D. *The Private Defendants' Claim of Exemption.*

The teaching of *Cantor v. Detroit Edison Co., supra,* is that the activities of a private party are exempt from the antitrust laws only if essential to the success of a state regulatory scheme, or if performed in compliance with a decision made by the state unilaterally.

▉ In its motion to dismiss, Surtran Taxicabs, Inc. (Surtran) argues that it performs the taxicab service here pursuant to a state policy to displace competition in the service of taxis from the airport. That policy, Surtran argues, is expressed in the Motor Bus Act, Tex.Civ.Stat.Ann. art. 911a (Vernon 1964) and implemented by the Texas Railroad Commission, which has granted to Surtran a certificate of public convenience and necessity to transport passengers from the airport to points in the ten surrounding counties. The act authorizes the Railroad Commission to regulate persons "engaged in the business of transporting persons for compensation or hire over the public highways within the State of Texas," but does not apply "within the limits of any incorporated town or city, and the suburbs thereof." Surtran's argument for exemption based on this law stumbles on several obstacles.

To begin with, there is some doubt whether the Railroad Commission's authority reaches the activity at issue here, since the taxicab service operates largely within the cities of Dallas or Fort Worth and their suburbs. Moreover, the Texas Court of Civil Appeals, in *Foster v. Railroad Commission,* 215 S.W.2d 267 (Tex.Civ.App.— Austin 1948), held that the Motor Bus Act does not even apply to taxicabs.

In addition, if the transportation at issue here is in interstate commerce (the question will be considered below), then the Railroad Commission lacks the power to regulate it. *See Hi-Ball Transit Co. v. Railroad Commission,* 27 F.2d 425 (N.D.Tex.1928) (Motor Bus Act held unconstitutional insofar as it applies to interstate commerce). More significantly, even if the Railroad Commission has the power to regulate the taxicab service involved here, Surtran must show that the allegedly anticompetitive practices were either mandated by the Commission or else essential to its regulatory scheme. Neither showing can be made.

The Railroad Commission, in granting the certificate, certainly did not require that Surtran carry on the permitted activities by means of an exclusive contract with Dallas and Fort Worth. At the very most, the Commission acquiesced in the arrangement, and that, according to *Cantor,* is insufficient state participation in the decisionmaking process to invoke the protection of *Parker v. Brown. See also United States v. Pacific Southwest Airlines,* 358 F.Supp. 1224 (C.D.Cal.), *cert. dismissed,* 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1973) (state approval of airline merger does not immunize merger from antitrust attack). Finally, it cannot plausibly be argued that the arrangement between Surtran and the cities is essential to the regulatory program under the Motor Bus Act, if indeed such a program exists for taxicabs.

In summary, the defendants in this case do not enjoy a state-action exemption from the operation of the antitrust laws. Their arrangement for providing taxi service at the Dallas-Fort Worth Airport was neither pursuant to a state policy to displace competition, nor essential to any state regulatory scheme, nor required by the state acting as sovereign. Consequently, under recent Supreme Court decisions, defendants do not have this escape from the federal antitrust laws.

## II. *Interstate Commerce.*

█ Several defendants argue that this case should be dismissed for lack of jurisdiction because the activities complained of are not within the reach of the federal commerce power. The general rule is that this jurisdictional requirement is met if the acts in question are either "in the flow of interstate commerce" or substantially "affect" interstate commerce. That formulation, however, provides only an initial compass heading. The remainder of the course is left for discovery in the facts of each case.

At the outset, though, it should be noted that the courts have consistently held that Congress, in enacting the Sherman Act, intended to avail itself of the full constitutional reach of the commerce power. *See,*

*e. g., United States v. Shubert,* 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955). Defendants place great emphasis on the decision in *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). That case involved antitrust claims against the operator of taxicab service at railroad stations in Chicago. In those portions of the opinion pertinent here, the court held that that part of the taxicab service that transported passengers between Chicago's two major railroad stations was in interstate commerce, but that the part of the service engaged in transporting passengers between the railroad stations and their homes and businesses was merely "local" in character and therefore not in interstate commerce.

There is a significant distinction between the taxi service involved in *Yellow Cab* and that involved here. In *Yellow Cab,* the taxis that transported passengers between the railroad stations and their homes did so as part of the general taxi service within the city; they did not serve the railroad stations exclusively. In the court's words:

> None of them serves only railroad passengers, all of them being required to serve "every person" within the limits of Chicago. . . . To the taxicab driver, it is just another local fare. 332 U.S., at 231, 232, 67 S.Ct. at 1567.

█ The character of taxicab service provided by Surtran is decidedly different. Surtran taxis serve airport passengers exclusively, the overwhelming majority of whom are completing interstate journeys. (Plaintiffs contend that 90% of deplaning passengers at the airport are arriving from points outside of Texas.) In an earlier portion of its opinion, the court in *Yellow Cab* suggested that such service fell within the purview of the commerce power:

> When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. 332 U.S., at 228, 67 S.Ct. at 1566.

Von Kalinowski suggests that the type of service involved here, since it is significantly different from that involved in *Yellow Cab,* might properly be considered "in" interstate commerce. 2 J. Von Kalinowski, Antitrust Laws and Trade Regulation § 5.01[2] n.94 (1969 & Supp.1978). And at least one court has held that a taxicab service nearly identical to the one in this case serving Houston Intercontinental Airport is within the reach of the commerce power. *Walker v. Houston,* No. 73–H–648 (S.D.Tex. Nov. 29, 1976).

It is the conclusion of this court, then, that the taxicab service involved here is in interstate commerce, and consequently, that this particular jurisdictional requirement of the Sherman Act is satisfied.

### III.  *Standing.*

■ Defendants advance several arguments in support of their contention that plaintiffs lack standing to maintain this suit. First, they argue that because plaintiffs are taxicab drivers rather than operators of taxicab corporations, they lack the requisite business interest to satisfy standing requirements. Second, they argue that plaintiffs have suffered at most only an indirect injury as a result of the defendants' conduct. Finally, defendants urge that plaintiffs have no legal interest in the outcome of this suit by virtue of their failure to obtain from the Texas Railroad Commission a certificate of public convenience and necessity to operate taxicab service at the Dallas-Fort Worth airport. For the reasons that follow, the court finds all of these arguments unsound.

The general requirements for standing to maintain an action under the Sherman Act have been repeated in various forms by every court that has had to consider the issue. *See,* Higginbotham, *Some Judicial Adjustments to the Rights of Recovery Under the Federal Antitrust Laws,* 26 Ala.L. Rev. 309 (1974). The gist of the rule is that a claimant must show that a violation of the antitrust laws was the direct cause of injury to his or her business or property and that he or she is within the class of persons

that Congress intended to protect. *See, e. g., Hennessey v. NCAA,* 564 F.2d 1136 (5th Cir. 1977); *Tugboat, Inc. v. Mobile Towing Co.,* 534 F.2d 1172 (5th Cir. 1976). Before considering in further detail the defendants' arguments with respect to standing, it is worth reflecting in a general way upon the nature of the class of plaintiffs that seeks to maintain this suit.

The putative class is composed of some 2,000 persons who hold permits to operate taxicabs from various cities and towns in the Dallas-Fort Worth region. Most of them operate as independent contractors; they own their own vehicles, provide their own maintenance, and set their own work hours. They pay a weekly "stand fee" to the taxicab companies for the right to use the company's radio-dispatch service and to exhibit the company's name. Others are closer to being employees of taxicab companies, but even these drivers are paid according to the amount of fares generated, which, of course, is directly related to the number of passenger miles traveled; yet, at least in Dallas, they are required to carry passengers to the airport. As a result, they are forced to return from the airport with no passengers, to their obvious economic detriment.

Looking to the allegations of the complaint the proffered class of persons would be directly injured by the arrangement challenged in this suit. Even the taxicab corporations are not harmed as directly, particularly those who earn revenues by means of "stand fees." There can be no serious question that these claimants are within the ambit of persons that the antitrust laws are designed to protect. Consequently, the various objections made by defendants to plaintiffs' standing to sue must be viewed with skepticism.

Surtran's argument that plaintiffs lack standing because they are not corporations seems to be based on the fact that only a corporation could have submitted bids for the privilege of serving the airport in the first place. The argument is circular, and there is no statutory or judicial precedent to support it. There is simply no requirement

that a Sherman Act claimant be a business entity. The requirement is simply that claimants show injury to their business, and this showing has been made here.

Defendants' argument that plaintiffs have no legal interest in the outcome of this suit because of their failure to obtain certificates of public convenience and necessity from the Texas Railroad Commission is equally unavailing. To begin with, there is a significant question as to the power of the Railroad Commission to regulate the taxicab service at issue here, both because it is in interstate commerce (see part II. of this Memorandum) and because decisions of the Texas courts have questioned the applicability of the Motor Bus Act to taxicab service (see part I. of this Memorandum). Moreover, as plaintiffs point out, it would have been futile for the plaintiffs here, or the taxicab companies with which they are associated, to obtain such certificates, for the contract and city ordinances that are the subject of this suit would still have prevented their effective implementation. While standing is both a constitutional and prudential matter, it is in its prudential dimension (to which this argument is addressed) a fundamentally practical concept. Denial of standing should not be premised on failure to obtain a useless document from an agency arguably without power to issue it.

In sum, plaintiffs here have adequately alleged a direct injury to their business, and they are within the sphere of protection contemplated by the antitrust laws. Consequently, they have standing to maintain this suit.

## IV. *Statute of Limitations.*

█ Several defendants argue that maintenance of this suit is barred by the statute of limitations. Section 4B of the Clayton Act, 15 U.S.C. § 15b prescribes a four year limitations period for treble damages actions, and this suit was commenced on May 22, 1978, more than four years after the contracts at issue here were entered into. Plaintiffs contend, however, that as a result of overt acts by the defendants in enforcing the alleged monopoly, their cause of action

has continued to accrue. The point is well taken.

The critical question is when plaintiffs' cause of action accrued for purposes of section 4B of the Clayton Act. The Supreme Court set forth its analysis of this issue in `Zenith Radio Corp. v. Hazeltine Research, Inc.,` 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). The court there reasoned as follows:

> Generally, a cause of action accrues and the statute begins to run when the defendant commits an act that injures a plaintiff's business. . . . In the context of a continuing conspiracy to violate the antitrust laws . . . this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. 401 U.S. at 338, 91 S.Ct. at 806.

In *Imperial Point Colonnades Condominium v. Mangurian,* 549 F.2d 1029 (5th Cir. 1977), *cert. denied,* 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977), the Fifth Circuit, citing *Zenith,* held that a 1975 claim alleging illegal tying arrangements in contracts dating as far back as 1969 was not barred by limitations because a new cause of action arose each time the defendant enforced the contracts by collecting rent. The court there reasoned that "[i]t seems reasonable to us not to permit a defendant to argue that a suit to recover damages caused by his recent acts is barred because a pre-limitations contract . . . purports to authorize the commission of such acts." 549 F.2d at 1041.

The reasoning of *Mangurian* is apposite here; but the recent decision in *El Paso v. Darbyshire Steel Co.,* 575 F.2d 521 (5th Cir. 1978) is not. *El Paso* involved a contract to supply steel for a construction project. The court distinguished *Mangurian* on the ground that any damages that might result from the steel supply contract "were provable with certainty" on the date it was signed. 575 F.2d at 523. No such argu-

ment can be made about the taxicab service arrangement here. One key element of the alleged conspiracy is the enforcement by defendants of the contracts and ordinances involved here, including the levy of fines against members of the plaintiff class who attempted to pick up passengers at the airport. The plaintiffs' claim continued to accrue each time they were denied the right to pick up passengers. Consequently, the statute of limitations does not bar the recovery of damages suffered during the four years before the filing of this suit.

## V. Private Property.

▮ Defendants argue that their combination which grants an exclusive right to pick up passengers on their property (D/FW airport) cannot be subjected to antitrust scrutiny. The court has already discussed the present degree of insulation from the federal antitrust laws enjoyed by a Texas municipality qua municipality. This argument is addressed to the rights of the cities as land owners. The distinction is a vital one. Many of the cases relied upon by defendants, and which indeed seem to support them are bottomed on the *Parker v. Brown* exemptive notion. *City of Lafayette* has proved that foundation to have been weak. Yet not all such cases were so rooted. Some present instead judicial efforts to resolve supposed conflicts between the rights of a property owner and the Sherman Act as well as judicial fiat that in proffered factual situations the combinations were reasonable as a matter of law. This oddity is noted not to slake the curious but to make plain that no precedent today fully controls this case.

### A. Per Se Legality for Location Exclusion.

In 1905 Justice Harlan writing for an unanimous court in *Donovan v. Pennsylvania Co.*, 199 U.S. 279, 26 S.Ct. 91, 50 L.Ed.

192 (1905) found no illegality in an exclusive arrangement between the Pennsylvania Company and the Parmelee Transfer Company. Parmelee was given exclusive access to a favored position within Pennsylvania's Chicago railroad station. Excluded hackmen attacked the combination in defending a suit in equity charging a nuisance. Justice Harlan did note that the exclusive contract was not ". . . a monopoly in the odious sense of the word . . . ." *id.* at 297, 26 S.Ct. at 95; however, the decision to enjoin the defendant taxicab operator from soliciting passengers was bottomed on general principles of property law. The Sherman Act was not the principal focus of the opinion. Regardless of that fact and despite the fact that *Donovan* preceded maturation of the rule of reason concept,[3] a careful reading reveals a judicial decision with benefit of a developed record that the combination was reasonable.

In *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), the court reversed a trial court dismissal of an attack upon conduct alleged to unreasonably restrain competition for the exclusive right to provide taxi service between Chicago's two major railroad stations. The court, in rejecting an argument that the conduct was legal under *Donovan*, noted that the restraint here was in competition for the exclusive right, stating ". . . [i]t is true, of course, that exclusive contracts for the transportation service in question are not illegal. *Donovan v. Pennsylvania Co.*, 199 U.S. 279, 26 S.Ct. 91, 50 L.Ed. 192."

Why this exclusive contract should enjoy a virtual judicial exception from antitrust scrutiny is not clear. There are, of course, two possible foundations for this result, distinct in origin and purpose.[4] They must be

---

**3.** The Sixth Circuit in 1898 (J. Taft) did introduce a concept of reasonableness, *see, United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898), *mod.* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), but the idea did not receive the imprimatur of the Supreme Court until 1911, six years after *Donovan*, in *United States*

*v. Standard Oil Co.*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

**4.** Unreasoned obedience of lower courts is another possibility, but needs no discussion here. The cases are sometimes called the terminal cases.

identified now if not in the past because we must learn what the erosion of state "immunity" has carried with it.

Some decisions have cited *Donovan* but have equally relied upon immunity of instrumentalities of state governments or other immunities. For example, in *E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority*, 362 F.2d 52 (1st Cir. 1966), the First Circuit cited both the Seventh Circuit opinion in *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794 (7th Cir. 1961) and *Donovan*, but also noted:

> . . . the only conduct of the defendants, Butler or Butler-Boston, alleged to have been in violation of the antitrust laws had to do with their dealings with the Authority in the exercise of a governmental function. . . . 362 F.2d at 56.

The second foundation for the terminal line of cases seems to be an effort to deal with the occasional factual circumstance that ownership of land may, because of its unique location or other property attributes, give to the landowner a specie of natural monopoly. It supports the idea that a contract that merely transfers exclusivity inherent in the ownership of real property is per se legal. These decisions do not articulate their doctrinal base. In *Export Liquor Sales, Inc. v. Ammex Warehouse Co.*, 426 F.2d 251 (6th Cir. 1970), the owner of a tunnel was held not to violate the Sherman Act by granting to a certain liquor salesperson the exclusive right to sell liquor in the tunnel. Judge McCree writing for the panel noted simply:

> Despite its age, *Donovan* enjoys continued vitality. *Id.* at 252.

Why such a contract is immune from antitrust scrutiny was not stated by the Sixth Circuit in *Export Liquor* nor in any of the cases it relied upon. This type of fiat has led to untoward distinctions by other courts seeking to avoid its reach. In *TV Signal Co. of Aberdeen v. American Telephone and Telegraph*, 462 F.2d 1256 (8th Cir. 1972), the Eighth Circuit was confronted by an argument that AT&T did not have to sell to plaintiff access to its privately-owned utility poles. The court found that the defendants' private property argument did not support dismissal, and *Export Liquor* was distinguished on the ground that the owner of the tunnel was not a competitor of the plaintiff. The reality of the found difference is unclear. The parties in *TV Signal*, while in the same general field of communications, were not in the same business.

*Export Liquor* also relied upon *Savon Gas Stations Number Six, Inc. v. Shell Oil Company*, 309 F.2d 306 (4th Cir. 1962). In *Savon*, the Fourth Circuit upheld a restrictive covenant in a shopping center lease. The covenant's only effect there, however, was to deny prospective customers direct access to plaintiff's gas station. The decision does not insulate such covenants from scrutiny but finds the covenant to be reasonable as a matter of law. Significantly, *Savon* is only the tip of another iceberg—the use of restrictive covenants in shopping center development. That body of law is not wholly inapposite. *See, Dalmo Sales Co. v. Tysons Corner Regional Shopping Center*, 308 F.Supp. 988 (D.D.C.), *aff'd*, 139 U.S.App. D.C. 22, 429 F.2d 206 (1970). *See, also*, Final Order, Tysons Corner Regional Shopping Center, [1973–1976 Transfer Binder] Trade Reg.Rep. ¶ 20,933, at 20,777 (1975).

The very notion of property ownership contains the right to enjoy to the exclusion of others the attributes of that property. In that property sense the exercise of "monopoly" power is permissible. But that is not necessarily monopoly power in the sense of the Sherman Act. A second attribute of that property right would be the right to sell or transfer. So far so good, but there remains the question of whether there is a principled distinction between a contract creating the exclusive right to deal by denying to all others the right to enter on land in order to compete and a contract that depends for its exclusivity only on an agreement not to deal with others. That is, why is one but not the other subjected to antitrust scrutiny? It may well be that such scrutiny may result in a great number of determinations that such a combination is

not unreasonable under the Sherman Act, but until the courts have had sufficient experience to conclude that they are inherently and inevitably reasonable, they ought not be dispatched on Rule 12(b) motions without any inquiry.

The natural monopoly argument appears to be a thread through the cases whose strength was not affected by cutting parallel and reinforcing threads of state action exemption. At the same time, however, the erosive force of *Cantor* and *Lafayette* has served to expose the thread and it must be independently examined. That it must be examined under the Sherman Act means only that its legality ought to be reviewed; not that it is illegal.

One can argue that the defendants could themselves alone have furnished the transportation; that accordingly, contracting for another to perform the same service has not displaced any competition. The argument would continue that to the contrary, because the exclusive contract was awarded by open bidding, competition for the service was actually enhanced. This argument is not without strength. A supplier of services or products may, consistent with the Sherman Act, agree with a distributor that it will not appoint a second distributor in a defined territory; the manufacturer may also with equal freedom terminate that distributor and replace it with another or by vertical integration distribute itself. In neither case is there a restraint of trade. True, there may be some reduction in intrabrand competition, but a manufacturer enjoys a natural monopoly in its own product and no competition in the *product line* is restrained.

The analogy of the natural monopolies in one's own product to that conferred by unique location is apt as far as it goes. The right of the manufacturer to a "downstream" exclusive arrangement with a distributor assumes that the other denied distributors have access to competing products; otherwise, even this transfer of a natural monopoly is questionable. By this reasoning the right of the defendants to grant access on an exclusive basis supposes

that the other denied suppliers have access. Moreover, the absence of antitrust consequences in distributor substitutions assumes the termination is not for a purpose itself illegal under the antitrust laws; *e. g.*, to punish for failure to adhere to resale prices.

B. *The Property Right of the Cities.*

The central premise of the cities' argument is that as owners of the airport, they enjoy a right of exclusion much like the owner of the tunnel in *Export Liquor*. The force of *Export Liquor* is reduced here, however, because the right to exclude others has been substantially relinquished by dedication to a use at least quasi-public in nature. That is, the essential bundle of property rights is here substantially less.

The right of exclusion, for example, is subject to the First Amendment rights of those who would use the public forum the cities have created. *See, International Society for Krishna Consciousness v. Dallas Fort Worth Regional Airport Board*, 391 F.Supp. 606 (N.D.Tex.1975). And in a factual situation nearly identical to that presented here, the Seventh Circuit in *Chicago Area Military Project v. Chicago*, 508 F.2d 921 (7th Cir. 1975) held that Chicago's O'Hare airport was a public facility.

> The City's claim that the public receives a limited invitation to use O'Hare Airport for travel purposes only is not supported by the evidence, nor do we find it realistic . . . [T]he fact is that great numbers of people are freely admitted to the public areas of the terminal buildings . . . 508 F.2d at 925.

There would not seem to be any significant difference between the airport discussed there and the Dallas-Fort Worth airport.

In addition, the cities' contention that the airport grounds are private property is undermined by a provision in the contract between the cities to establish the Surtran System. Paragraph Nine of that contract provides:

> The acquisition of any land or interest therein pursuant to this Agreement . . . are hereby declared to be public and governmental functions exercised for a pub-

lic purpose . . . . All lands and other property and privileges acquired are hereby declared to be acquired for municipal, public and governmental purposes.

The teaching of the First Amendment airport cases for our present purposes is not that the cities as owners of the airport do not have property rights; because they obviously do. Nor is the teaching that those property rights are so insufficient that no one can be excluded from the airport grounds.[5] The lesson is that the property right to selectively exclude is subordinate to rights enjoying higher relative rank. That is, these property interests obviously are subordinate to the congressionally mandated policy of the Sherman Act—at least when the asserted property interests are so diluted by public dedication. It follows that the validity of the contracts at issue turns on traditional antitrust inquiry into the reasonableness of the restraint—one factor of which is the property interests to be protected. The absence of restraint on the face of the complaint, as in many cases where a manufacturer simply substitutes one distributor for another, is not apparent. Nor is it clear now as a matter of law, assuming as we must at this stage of the

case that all alleged facts are true, that an unreasonable restraint of trade has not been created.

This analysis does not turn wholly on the rights of the cities to exercise any right they may have to forbid entry for pick up and delivery at the air terminals. The cities of Grapevine and Irving have adopted by ordinance the accused regulations providing that only holders of permits issued by the airport board may provide ground transportation from the airport.[6] Why cities with no ownership interest have joined in cannot be determined on a Rule 12 motion. See discussion below in part VII. of this Memorandum.

### VI. *Parties.*

█ The final argument advanced by Surtran in support of its motion to dismiss is that plaintiffs have failed to join the Texas Railroad Commission as a defendant in this action. In light of the discussion concerning the question as to the Commissioner's jurisdiction to govern the activities at issue here, the argument that the Commission is a necessary party to this action is without merit.

---

5. One aspect of the complex interplay of property rights with First Amendment rights was discussed by this court in *International Society for Krishna Consciousness v. State Fair of Texas,* (N.D.Tex.1978), 461 F.Supp. 719. It is significant that the first amendment rights of the plaintiffs here are not wholly insubstantial under a recent line of cases finding commercial speech within the ambit of first amendment protection. *See, Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) *and Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).

6. The portions of Dallas-Fort Worth Airport Board Resolution 71–172, October 5, 1971, pertinent here read as follows:

Chapter Two, Section 8, Solicitation of Ground Transportation.

It shall be unlawful for any person to solicit ground transportation business on the Airport, or to pick up passengers or baggage for hire on the Airport without a ground transportation permit from the Airport Board, or without having an Airport Board Concession License or Franchise therefor, and to the extent of any operations outside the Airport

Boundaries, without a license, permit or franchise from any City through which said business is conducted if lawfully regulated by the ordinances of any such city.

Chapter Three, Section 4. Soliciting.

(c) It shall be unlawful to solicit any business or trade, including transportation of persons or baggage for hire on the Airport without a permit, concession or franchise from the Airport Board, and, to the extent of any operations outside the Airport Boundaries, without a license, permit, or franchise from any city through which said business or trade is conducted if lawfully regulated by the ordinances of any such city.

Chapter Four, Section 3. Penalty, Continuing Violations.

The violation of any provision of this Code where an act or failure to act is made unlawful or is otherwise prohibited, shall be punished by a fine not to exceed Two Hundred Dollars ($200.00), and each day a violation shall continue shall constitute a separate offense; provided, however, where the offense is one for which a penalty is fixed by state law, the latter penalty shall govern.

## VII. *Irving and. Grapevine.*

The cities of Irving and Grapevine are in a somewhat unique position with regard to this lawsuit. Portions of the airport are located within the boundaries of these cities; otherwise, they are connected with the activities challenged here only by virtue of their adoption by ordinance of the airport Code of Rules and Regulations (see part V. above). Irving contends that under the Municipal Airport Act its adoption of the code is of no legal effect. Irving cites the following provision of that Act:

> To the extent that an airport or other air navigation facility controlled and operated by a municipality is located outside the territorial limits of the municipality, it shall . . . be under the jurisdiction and control of the municipality controlling or operating it, and no other municipality shall have any authority to charge or exact a license fee or license tax for operations thereon. Tex.Civ.Stat.Ann. art. 46d–7 (Vernon 1969).

The problem with the argument is that article 46d–7 does not prohibit Irving from exercising any authority at the airport; it prohibits only the charging of a license fee or occupation tax. Thus if a driver were prosecuted by Irving for picking up a passenger at the airport, it is at least problematic whether he would be able to defend on the basis of article 46d–7. At this stage of the proceedings, then, Irving and Grapevine cannot be dismissed as defendants in this suit. Their lending of their enforcement regime to the exercise by the cities of Fort Worth and Dallas of a right to exclude from owned property raises further questions not answerable in a Rule 12 motion, including the question of a concerted refusal to deal. *See, Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir.), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

### Conclusion

None of defendants' arguments supports dismissal of this suit. There is no warrant for carving an exception from the federal antitrust laws for the cities' delivery of ground transportation at the airport. This opinion does not hold that the present arrangement between Surtran and D/FW is illegal; it only holds that it must stand for antitrust inspection.

When this case is stripped bare of the legal complexities of these thirty pages, the result is both easily stated and hardly startling. If the cities wish to supply the ground transportation to one of the largest airports in the world in competition with those in the business of ground transportation, it must play by the same competition rules as others. It may be that the cities by doing so will not only increase their return but also by competition improve the quality of services to the patrons of the airport. The entrepreneurial spirit that created this airport must subscribe to such types of results. So does the Sherman Act.

The motions to dismiss filed by Surtran Taxicabs, Inc. and by the Cities of Dallas, Fort Worth, Grapevine, and Irving are therefore DENIED. A hearing on class certification will be held before February, 1979.