**PINEHURST AIRLINES, INC., Plaintiff,**

v.

**RESORT AIR SERVICES, INC., Moore County Board of Commissioners, Moore County Airport Committee, W. Sidney Taylor, Dr. Charles Phillips, W. P. Davis, Wilton Brown, and E. C. Timberlake, Defendants.**

**PINEHURST AIRLINES, INC., Plaintiff,**

v.

**Marie McKENZIE, Defendant.**

**Nos. C–77–565–R, C–78–372–R.**

United States District Court, M. D. North Carolina, Rockingham Division.

June 12, 1979.

As Amended Nov. 1, 1979.

Noel Lee Allen, Raleigh, N. C., H. M. Burwell, Gen. Counsel, for Pinehurst Airlines, Inc.

James R. Van Camp and Vance A. Derby, Southern Pines, N. C., for Resort Air Services, Inc. and Marie McKenzie.

William F. Womble, Jimmy H. Barnhill and Joseph T. Carruthers, Winston-Salem, N. C., for other defendants.

## MEMORANDUM ORDER

GORDON, Chief Judge.

These cases were noticed for hearing in the United States Courtroom, Greensboro, North Carolina, on January 23, 1979, on motions to dismiss by the defendants and on plaintiff's motion to consolidate. Noel Lee Allen, Raleigh, N. C., and H. M. Burwell appeared as counsel for the plaintiff; William F. Womble, Jimmy H. Barnhill, Joseph T. Carruthers, Winston-Salem, N. C., and James R. Van Camp, Southern Pines, N. C., appeared as counsel for the defendants. Having heard the oral arguments and studied the briefs submitted by the parties, the Court concludes that the defendants' motions to dismiss should be granted in part and denied in part and that the plaintiff's motion to consolidate should be granted.

## DISCUSSION

### Defendants' Motions to Dismiss

In this action Pinehurst Airlines ("Pinehurst") has alleged violations of federal antitrust statutes, state statutory and constitutional antimonopoly provisions, and federal and state constitutional rights of due process and equal protection. The allegations are based on various disputes that arose out of the relationship between the plaintiff and the defendants during the course of plaintiff's operations at the Southern Pines, North Carolina, Airport ("Airport"). The gravamen of the complaint is Pinehurst's claim of unfair and

favored treatment that Resort Air Service, Inc. ("Resort") allegedly received, such that it enjoyed a monopoly at the airport as its only Fixed Base Operator ("FBO").[1] It also claims that a conspiracy existed among all the defendants, the purpose of which was to prevent the plaintiff from obtaining a similar FBO status, or, at the least, from expanding its operations to service and maintain its own aircraft. Pinehurst also claims the conspiracy manifested itself through various acts of harassment. Pinehurst seeks treble damages, injunctive relief, costs and attorneys fees.

All defendants in both cases have filed motions to dismiss under Fed.Rules Civ. Proc. 12(b)(1) and (6). Where the arguments of the defendants are the same, they will be treated together, but where that is not the case, the Court will identify the party advancing the argument in question. Since McKenzie's 12(b) motions incorporate the contentions asserted by the other defendants, what is said as to their motions applies to McKenzie's as well.

### I. *Jurisdiction*

### (a) *Generally*

Several preliminary arguments have been advanced which the Court will now consider. Resort contends that the complaint should be dismissed for lack of standing. In *Warth v. Sedlin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the Supreme Court stated that, in considering a motion to dismiss for lack of standing, a trial court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Id.* at 501, 95 S.Ct. at 2206. Although there are distinctions between the concept of standing and those of exhaustion of remedies and primary jurisdiction, *see* 3 K. Davis, Administrative Law Treatise §§ 19.01, 20.01 (1958), the similarities between them are strong enough to call for

them to be treated alike procedurally, and the Court will do so.[1a]

### (1) *Standing*

█ Resort argues that Pinehurst lacks standing due to the claimed failure of the plaintiff to allege that it would have succeeded as an FBO operator and to compute how it has lost the profits it claims to have lost. Pinehurst has brought the present action pursuant in part to Section 4 of the Clayton Act, 15 U.S.C. § 15. That statute states in pertinent part that suit may be brought for violation of the antitrust laws by anyone injured in his business or property "without respect to the amount in controversy." Thus, although the plaintiff has yet to prove its allegations of damage in sum certain, the allegations in the complaint, taken as true, are sufficient to sustain the plaintiff's burden at this point of showing some injury. For the same reasons, Resort's argument that plaintiff has failed to show injury to its business or property must be rejected, and the Court concludes that Pinehurst has standing to bring the instant antitrust action.

### (2) *Exhaustion of Remedies*

█ Defendants argue that Pinehurst has failed to seek administrative redress of all its alleged injuries from the FAA and thus is barred from bringing the present action until it does so. Pinehurst claims, and the Court accepts as true, that it has sought such redress but to no avail, and for a period of some three years before and until the present suit was filed. Moreover, it is undeniable that that agency's remedial powers are limited to cease and desist orders which can only proscribe future violations. *See* 49 U.S.C. § 1482, *et seq.* It cannot grant damages for past wrongs, so that if the Court were to stay the present proceedings for administrative action, plain-

---

1. The Court was informed at oral argument that an FBO supplies services and materials to airplanes much the same as gas stations deliver to motorists.

1a. Standing, exhaustion of remedies and primary jurisdiction also bear close affinity to the

issues of ripeness and mootness. *Warth, supra* at 499 n. 10, 95 S.Ct. 2197. The Court thus implied that ripeness and mootness would be treated in a similar manner when advanced as grounds for a motion to dismiss.

tiff would in effect be seeking nugatory relief. *Accord, Niswonger v. American Aviation, Inc.*, 411 F.Supp. 763, 768 (E.D. Tenn.1975). For these reasons the defendants' exhaustion of remedies argument is unpersuasive.

### (3) *Primary Jurisdiction*

■ The doctrine of primary jurisdiction comes into play in cases which raise issues of fact not within the conventional experience of judges or which require the exercise of administrative discretion. *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952). The doctrine functions not to determine whether the court or agency will finally decide an issue; rather it serves to delay the judicial decision until the court can take advantage of the agency's expertise. It also promotes uniform decision making in cases involving regulated industries. *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303–04, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). Neither of these policies would be served by issuance of a stay in the present case. All of the plaintiff's contentions except one [2] are grounded in antitrust concepts, a field in which the FAA has no special expertise. Nor are there issues of fact present that are not within the conventional experience of judges. Even with regard to the cause of action based on an alleged violation of the Federal Aviation Act,[3] it appears that the FAA has determined such a violation occurred.[4] Construing the complaint in favor of Pinehurst, the Court concludes that to stay the present action while the plaintiff returns to the FAA would be pointless.

The motions to dismiss as they are based on this argument should, therefore, be denied.

### (b) *Subject Matter Jurisdiction*

### (1) *Interstate Commerce*

■ Resort argues that the interstate commerce component of the plaintiff's federal antitrust claims is not present in this case. "The general rule is that this jurisdictional requirement is met if the acts in question are either 'in the flow of interstate commerce' or substantially 'affect' interstate commerce." *Woolen v. Surtran Taxicabs, Inc.*, 461 F.Supp. 1025, 1033 (N.D.Texas 1978); *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 420, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (Burger, C. J., concurring). Moreover, the Court notes that it has often been held that Congress, in enacting the Sherman Act, intended to avail itself of the full constitutional reach of the commerce power. 461 F.Supp. at *id.* Here the acts complained of are the alleged conspiracy among the various defendants, acts of harassment, and the denial of various requests for expansion of plaintiff's facilities at the airport, which denials allegedly caused plaintiff to bear increased costs and reduced profits from its interstate cargo transport service. Thus, Resort's argument that mere FBO activity alone will not supply the interstate component of the antitrust claim is off the mark. Plaintiff does not contend that Resort's status as such caused it to suffer harm, but rather that the acts of the owners and operators of the Airport damaged its business. *Cf. Rachal v. Allen*, 376 F.2d 999, 1004 (5th Cir. 1967).

---

**2.** That allegation is set out in Paragraphs 54–55 of the complaint. It charges that the alleged monopoly position Resort enjoyed as the alleged sole FBO at the Airport violated N.C.G.S. § 63–53 (presumably subsection (2) thereof) in that such a monopoly was in violation of the provisions of the Federal Aviation Act. *See* note 18, *infra.* Section 63–53 is reproduced in an appendix hereto.

**3.** *See* note 2, *supra.*

**4.** In a letter from Harold E. Little, Chief of the Airports District Office of the FAA, to W. S. Taylor, Chairman of the Moore County Board of Commissioners, Mr. Little stated that in re-

sponse to Pinehurst's complaint to the FAA which charged that Moore County had discriminated against Pinehurst, the FAA had concluded that the lease between the airport and Resort "did in fact amount to a granting of exclusive aeronautical rights in violation of law and the terms of your Grant Agreements with the United States." *See* Exhibit 15 to Plaintiff's Brief in Opposition to Motions to Dismiss Complaint. The same letter appears as Exhibit F to the Brief in Support of Motion to Dismiss of defendants Board, Moore County Airport Committee ("Committee"), Taylor, Phillips, Davis, Brown and Timberlake.

Construing the complaint favorably to the plaintiff,[5] the Court concludes that the interstate commerce element of the plaintiff's federal antitrust claims is present.

#### (c) *Failure to State a Claim*

##### (1) *Statute of Limitations*

 It is now agreed that a party may raise the defense of limitations by means of a 12(b) motion. *See generally*, 2A Moore's Federal Practice ¶ 12.10. Suit against Marie McKenzie was not filed until August 10, 1978, nearly a year after Pinehurst sued the defendants in No. C–77–565–R. She is the only defendant to raise the statute of limitations argument. She contends that the federal antitrust claims are time-barred as to her by the four year limitations period set out in 15 U.S.C. § 15b.[6] Pinehurst's complaint charges that the defendant McKenzie engaged in the alleged conspiracy with the other defendants named in No. C–77–565–R "to establish and maintain Resort Air Service in a monopoly position." The statute of limitations under 15 U.S.C. § 15b begins to run when the defendant commits an act which injures the plaintiff's business. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Pinehurst has alleged a continuing conspiracy to violate the antitrust laws, Complaint ¶ 22, with respect to which the statute begins to run from the commission of each and every act by the defendants that injures the plaintiff. 401 U.S. at *id.*, 91 S.Ct. 795. Pinehurst has alleged[7] that defendants performed acts injurious to it and pursuant to the conspiracy within four years of the date on which the complaint in C–78–372–R was filed. The Court accordingly must reject the limitations defense to the federal antitrust claims and deny the motion to dismiss that is based on that limitation.

 McKenzie also claims that the allegations in Count IV are likewise time-barred by the three-year North Carolina statute of limitations. Chapter 75 of the North Carolina General Statutes contains no specific limitations period for actions brought pursuant to its provisions, so the Court must look to the general limitations sections. N.C.G.S. § 1–52(2) (1977 Cum. Supp.) prescribes a three-year statute of limitations for actions brought upon a liability created by a statute such as the claims set out in Count IV, and the Court concludes that this is the proper limitation period. As stated above, Pinehurst alleges a continuing conspiracy and claims injuries for acts done within three years of the commencement of the present action against McKenzie. For this reason, the Court must deny the motion to dismiss insofar as it is grounded upon the state statute of limitations argument.

#### (2) *Conspiracy*

 Resort contends that plaintiff has failed to state a valid claim under that part of the Sherman Act that prohibits conspiracies in restraint of trade. It reasons that since no defendant except Resort is a "person in trade," there can be no unlawful conspiracy. *GAF Corp. v. Circle Floor Co.*, 329 F.Supp. 823 (S.D.N.Y.1971). Not only is there a presumption against implied exclusions from coverage under the antitrust laws, *Lafayette, supra*, 435 U.S. at 398, 98 S.Ct. 1123, but the Supreme Court has held that municipalities are "persons" within the meaning of § 8 of the Sherman Act, *Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906), and that the words "any person" in Section 7 of that Act encompass states. *Georgia v. Evans*, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942). Based on this prece-

---

**5.** *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

**6.** That section states in pertinent part that "[a]ny action to enforce any cause of action under sections 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued."

Plaintiff's federal antitrust action is brought under 15 U.S.C. § 15.

**7.** *See* Paragraphs 22, 23, 35 and 42. The Court accepts these allegations as true for the purposes of the motions to dismiss. *Scheuer v. Rhodes, supra*.

dent, the Court concludes that Moore County, the Board and the Committee are "persons" within the meaning of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

### (3) *Relevant Markets*

 Resort attacks plaintiff's § 2 Sherman Act claim for its alleged failure to set out the relevant geographic and product markets involved. However, the complaint alleges that the Airport is the only one in Moore County that is federally funded and equipped to service passenger air service for the Southern Pines resort community. Plaintiff thus has alleged a geographic market. Plaintiff also has alleged that Resort enjoys the position as the sole FBO at the airport, which clearly implies the allegation that Resort is monopolizing the market for all products and services required and used by customers of the airport FBO. Plaintiff thus has described an adequate product market over which Resort allegedly enjoys a monopoly. Based on these allegations, the Court concludes that sufficient markets have been alleged by the plaintiff to support its § 2 claim.

### (4) *Governmental Exemption*

As with numerous other lawsuits, this case took on a completely new complexion after the Supreme Court rendered its decision in the *Lafayette* case. Prior to that decision it was widely assumed that *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), granted a blanket immunity from the federal antitrust laws to states and their subdivisions when engaging in purely state governmental activity, or official activity directed by a state. *See New Mexico v. American Petrofina, Inc.*, 501 F.2d 363 (9th Cir. 1974); *Ladue Local Lines, Inc. v. Bi-State Development Agency*, 433 F.2d 131 (8th Cir. 1970); *E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority*, 362 F.2d 52 (1st Cir.), *cert. denied* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); *Murdock v. City of Jacksonville*, 361 F.Supp. 1083 (M.D.Fla.1973). The Court in *Lafayette*, however, relying on *Goldfarb v.*

*Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), and *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), rejected the contention that a governmental entity's status as such automatically affords it the "state action" exemption. 435 U.S. at 411, 98 S.Ct. 1123. Rather, the Court concluded that "the *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137. More to the point for the present case is this comment on the status of municipalities:

> "[W]e agree with the Court of Appeals that an adequate state mandate for anti-competitive activities of cities *and other subordinate governmental units* exists when it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.' " *Id.* at 415, 98 S.Ct. at 1131 (emphasis added).

It is, of course, somewhat easier to discern the intent underlying federal legislation, due to the availability of the legislative history of a particular statute, than when a Court deals with state legislation. In North Carolina, as elsewhere, there is no such history. Perhaps foreseeing the problems associated with this lack of guidance, the Fifth Circuit declared that

> "Whether a governmental body's actions are comprehended within the powers granted to it by the legislature is, of course, a determination which can be made only under the specific facts in each case. A district judge's inquiry on this point should be broad enough to include all evidence which might show the scope of legislative intent."

532 F.2d 431, 434–35 (footnotes omitted). Before engaging in an attempt to discern the North Carolina legislature's intent when it enacted the statutes in question,[8] the Court notes that such an exercise has

---

**8.** *See* Appendix.

been criticized as vague, elusive and an "unwarranted limitation upon governmental immunity from the antitrust laws." 435 U.S. at 435, 437 n. 19, 98 S.Ct. at 1149 (Stewart, J., dissenting). *See also* Bangasser, *Exposure of Municipal Corporations to Liability for Violations of the Antitrust Laws: Antitrust Immunity after the City of Lafayette Decision*, 11 Urb.Law. vii, xxiv–xxvi (1979); Note, *The Erosion of State Action Immunity from the Antitrust Laws: City of Lafayette v. Louisiana Power & Light Co.*, 45 Brooklyn L.Rev. 165, 182 (1978). Without entering the fray, the Court does admit to some difficulty in identifying and applying the proper standard under *Lafayette*. Nevertheless, study by the Court has convinced it that the state action exemption should not be applied in this case.

█ Initially the Court points out that the Moore County Board of Commissioners' ("Board") operation of the Airport is a proprietary undertaking. *See Piedmont Aviation, Inc. v. Raleigh-Durham Airport Authority*, 288 N.C. 98, 102, 215 S.E.2d 552, 555 (1975). To Chief Justice Burger, at least, the only issue presented by the *Lafayette* case was "whether the Sherman Act reaches the proprietary enterprises of municipalities," 435 U.S. at 422, 98 S.Ct. at 1141 (Burger, C. J., concurring) (footnote omitted), and thus a crucial and initial inquiry for a Court to make is whether the activity in question is proprietary or governmental. The nature of the activity was also of concern to the *Lafayette* plurality, although to lesser degree. *Id.* at 410, 98 S.Ct. 1123. The extent of the plurality's concern was perhaps delineated by Mr. Justice Marshall's comment that "any implied 'state action' exemption from the antitrust laws should be no broader than is necessary to serve the State's legitimate purposes." *Id.* at 417, 98 S.Ct. at 1139 (Marshall, J., concurring). Thus, although a particular area of activity may be directed or authorized by the state, the actual implementation of that authorization or directive can fall outside of that which the legislature intended and thus not be covered by the *Parker* doctrine. In short, the Chief Justice apparently would not apply the *Parker* doctrine anytime nonproprietary activity is questioned, but the plurality would undertake the state action inquiry regardless of the type of activity. *Id.* at 408, 98 S.Ct. 1123. With due deference to the Chief Justice's position, this Court is constrained to follow the approach suggested by the *Lafayette* plurality.[9]

█ In deciding the instant question, it is instructive to note, as did Chief Justice Burger, that a long line of Louisiana cases holds that cities are to be treated in the same way and under the same rules as private corporations and individuals, at least in the context of the ownership and operation of electrical utilities. *Id.* at 424, 98 S.Ct. 1123 (Burger, C. J., concurring) (citing cases). There is virtually identical language in several North Carolina cases that deal with the operation of municipal airports. *See Raleigh-Durham Airport Authority v. Stewart*, 278 N.C. 227, 231, 179 S.E.2d 424, 427 (1971); *Harrelson v. City of Fayetteville*, 271 N.C. 87, 93, 155 S.E.2d 749, 754 (1967).[10] This dovetails with the conclusion of the North Carolina courts that the operation of an airport is a proprietary function, and supports the argument of plaintiff that the *Parker* exemption should not cover the operation of the Airport.

The North Carolina Supreme Court's decision in *Stewart* is even more pertinent in another way. In that case the Airport Au-

---

9. Such an approach is all the more appropriate due to the factual context of this case and to the guidance provided in the North Carolina cases.

10. Although both cases dealt with slightly different activities, *Stewart* with car rental and *Harrelson* with limousine service, each discussed statutes that are essential to the present case. At oral argument the plaintiffs asserted that since the enabling legislation for the municipalities in the *Harrelson* case, N.C.G.S. § 63–2, differs from that in this case, N.C.G.S. § 63–3, any holding in *Harrelson* could not be dispositive of the issue in the instant case. The differences between those statutes are rather minor, and while *Harrelson* may not be controlling, the Court finds it and the *Stewart* case quite helpful and will refer to those cases where appropriate.

thority sought an injunction against a car rental firm which operated from leased property adjacent to the airport. The defendant rented cars to passengers who used the airport but it did not solicit customers upon the airport grounds, nor did it leave its vehicles at the airport other than in the course of picking up or leaving its customers.[11] The trial judge granted the injunction but the North Carolina Court of Appeals reversed. 9 N.C.App. 505, 176 S.E.2d 912 (1970). In affirming the Court of Appeals, the North Carolina Supreme Court relied upon the *Harrelson* decision and restated its adherence to the principle that a municipal corporation operating a publicly owned airport has the authority to grant an exclusive license or concession to one company to furnish taxicab or limousine service at the airport. 278 N.C. at 231, 179 S.E.2d at 427. The Court refused, however, to extend that holding to the facts before it in *Stewart.* It stated:

"A distinction is made, however, between the authority of such a carrier to grant such an exclusive permit, or concession, to enter or stand upon its property for solicitation of patronage and its authority to deny admission to its premises to discharge a passenger and his baggage, or to pick up a passenger and his baggage, pursuant to a contract previously made between such passenger and the taxicab operator."

*Ibid.* In explaining its reluctance to extend the *Harrelson* rationale, the Court pointed out that the source of the right asserted by the defendant in *Stewart* derived not from any right or interest of the defendant but from the "right of the passenger to convenient ingress and egress to and from the terminal of the common carrier." *Ibid.* To grant the requested injunction, the Court concluded, would effectively deny the passenger his right to convenient ingress and egress. 278 N.C. at 234, 179 S.E.2d at 429. It also would have the potential to create many of the pernicious side effects of unregulated monopoly,[12] not the least of which is an increase in costs paid by the consumer. Not surprisingly, this concern for the protection of the consumer is a prime focus of the antitrust laws. *See generally* Bork, *Legislative Intent and the Policy of the Sherman Act,* 9 J.L. & Econ. 7, 11 (1966). This concern for the rights of consumers, expressed as it is by the North Carolina Supreme Court,[13] argues heavily in favor of the position that the legislative intent behind N.C.G.S. § 63–53(3) was to subject municipalities to antitrust scrutiny when they conduct proprietary operations.

The same concerns are no less operative in the present context. As stated before,[14] an FBO provides services similar to those that a service station provides for those who operate automobiles. If such FBO has an exclusive license for servicing airlines that use a particular airport facility, the potential for anticompetitive abuses becomes obvious. By the same token, the potential effect on at least two segments of society, the airlines and their customers, can

---

11. The airport had granted concessions for car rentals to three companies other than the defendant, all of which paid a fixed fee plus a percentage of their gross receipts for this privilege. The defendant obtained customers in one of three ways: the customer would go in person from the airport to the defendant's place of business and there contract for and receive the rental auto; the customer would call the defendant from a public phone in the airport terminal and be picked up by the defendant's employee and be taken to the defendant's premises; or the customer would make arrangements prior to his or her arrival at the airport and be met by the defendant's employee and again be taken to defendant's premises. 278 N.C. at 229, 179 S.E.2d at 426.

12. *See* 435 U.S. at 392 n. 6, 419, 98 S.Ct. 1123; Note, *supra* at 172–73 nn. 42–44.

13. While the Court realizes that this interpretation of the legislative intent behind § 63–53(3) by the North Carolina Supreme Court would be controlling in a case with facts identical to those in *Stewart* or *Harrelson, see Paine v. Baker,* 595 F.2d 197, 199 (4th Cir. 1979), and that the argument for its being controlling in our case is correspondingly less compelling, it cannot be gainsaid that the facts of this case are rather close to the facts of those two cases, and the North Carolina Court's interpretation of that intent, implicit though it may be, is to be given considerable weight.

14. *See* note 1, *supra.*

be significant. There is no party of which the Court is aware that could supply the services that Resort supplies, in a manner similar to the way in which the defendant in *Stewart* carried on its car rental business. The *Stewart* Court found nothing objectionable to exclusive franchises for car rental and solicitation on airport property as long as access to airport customers by third parties was not prohibited. In the present case, absent a grant of FBO status by the airport authorities and the establishment by the grantee of FBO facilities on airport property, there may be no way for a third party to compete in any effective manner with Resort's FBO operation.

Equally persuasive, perhaps, is the language of § 63–53(3) itself. That statute provides in pertinent part that a county which has established an airport is authorized, among other things, "to confer the privileges of concessions of supplying upon its

airport goods, commodities, things, services and facilities; *provided that in each case in so doing the public is not deprived of its rightful, equal, and uniform use thereof.*" [15] (Emphasis added.) The emphasized language clearly contemplates that limits of some sort will be placed upon the activities of municipalities while engaged in the proprietary activity of operating a publicly owned airport. [16] Antitrust scrutiny would again seem to be proper.

Based on the above considerations, the Court concludes that it has reviewed "all evidence which might show the scope of the legislative intent," *Lafayette v. Louisiana Power & Light Co.*, 532 F.2d 431, 435 (5th Cir. 1976) (footnote omitted), and that the legislative intent behind § 63–53 was not to direct or authorize the grant by the Board to Resort of an exclusive FBO status at the Airport, [17] if in fact such an

15. Similar language appears in N.C.G.S. § 63–53(5) (1975 Replacement); that section governs charges and rentals levied for the use of airport properties under the control of the municipality.

16. *Accord, Woolen v. Surtran Taxicabs, Inc., supra.* In that case, Judge Higgenbotham answered one of the arguments posited by the Board: that since the County would have the right to operate its own FBO facility, even assuming it has granted an exclusive FBO status to Resort, it still has done nothing indirectly that it could not properly do directly. As Judge Higgenbotham stated, the principle to be recognized here

"is not that the [municipalities] as owners of the airport do not have property rights; because they obviously do. Nor is the teaching that those property rights are so insufficient that no one can be excluded from airport grounds. The lesson is that the property right to selectively exclude is subordinate to rights enjoying higher relative rank. That is, these property interests obviously are subordinate to the congressionally mandated policy of the Sherman Act—at least when the asserted property interests are so diluted by public dedication."

*Id.* at 1039 (footnote omitted). It is appropriate to note, by way of comparison, that the North Carolina legislature has declared that "The acquisition of any lands for the purpose of establishing airports . . . [is] hereby declared to be [a] public . . . [function]." N.C. G.S. § 63–50 (1975 Replacement); and that "Any lands acquired, owned, controlled or occupied by such cities, towns, and/or counties

. . . shall and are hereby declared to be acquired, owned, controlled and occupied for a public purpose . . .." N.C.G.S. § 63–5 (1975 Replacement).

17. The Court notes that there also has been no showing to support the conclusion that the denial of FBO status to Pinehurst was "necessary to effectuate governmental purposes." 435 U.S. at 418, 98 S.Ct. at 1139 (Marshall, J., concurring). Such a showing, although perhaps not required by the *Lafayette* opinion, would be helpful in deciding whether that denial was justified. Nor, of course, has there been any showing that the denial of the plaintiff's FBO application was "*essential* to the State's plan" to supercede competition. 435 U.S. at 425 n. 6, 98 S.Ct. 1123 (Burger, C. J., concurring) (emphasis in original). Although the Chief Justice would require the higher showing of essentiality by a municipality to come under the *Parker* doctrine, he joined in the plurality's directions that the defendant must show that such activity was "direct[ed] or authorize[d]" by the state. 435 U.S. at 417, 98 S.Ct. 1123 (Brennan, J.). Through this concurrence, the *Lafayette* opinion sets out the appropriate test of *Parker* immunity. The contention of Resort that the correct standard to apply is "whether the legislature contemplated the kind of action complained of," based as it is on the Fifth Circuit's opinion, is thus misplaced. The Supreme Court undoubtedly affirmed the Fifth Circuit, but it did not agree that the test espoused by the circuit court and the defendant here was the correct one.

arrangement existed. The Court therefore concludes that the motion to dismiss, insofar as it is based upon the *Parker* doctrine of immunity for state action, should be denied.[18] The same result is dictated for the motion to dismiss as it relates to the other allegations made by plaintiff which defendant argues are authorized or directed by the state under § 63–53(3).[19] The motion should be denied as well with respect to the claims defendant argues are authorized or directed by § 63–53(5).[20]

It is appropriate to emphasize that, even though the North Carolina legislature may not have directed or authorized the acts in question, all hope for avoiding liability is not thereby lost.[21] The Court expresses no opinion as to whether any antitrust violation has occurred, nor does the Court express any opinion as to the proper standard

of review that the Court should employ in assessing the antitrust implications of the questioned acts at a later date.[22] The Court does recognize, however, that there are serious implications involved in holding a municipality subject to antitrust actions in the present and related contexts. *See* Bangasser, *supra*, at xxxii–iii; Note, *supra* at 186–90. It must also be recognized, though, that our municipalities have overcome seemingly monumental problems in the past, and if the end result of the *Lafayette* case is that municipalities are removed as the operators of airports, it is too early to make a judgment as to the pros and cons of such a result. There also exists the possibility that state legislatures will make explicit the right of state subdivisions to provide monopoly services, either through the language of the statutes themselves or

**18.** *Accord, Woolen, supra.* The state legislation scrutinized in *Woolen* is comparable to N.C.G.S. § 63–53(2). The crucial section of the Texas statute in Judge Higginbotham's opinion was Tex.Civ.Stats.Ann. art. 46d–7(b) (Vernon 1969). It states that municipal ordinances governing public airports must not be "inconsistent with, or contrary to, any Act of the Congress of the United States or laws of this State . . . ." N.C.G.S. § 63–53(2) states that such ordinances "shall be kept in conformity, as nearly as may be, with the then current federal legislation governing aeronautics . . . ." The North Carolina statute is narrower than its Texas counterpart, and might not be enough, by itself, on which to base the Court's disposition of the defendants' *Parker* argument. That issue is not before the Court, however, and the Court declines to rule thereon.

**19.** Those allegations include the following activities performed by the Board and the Committee in furtherance of the alleged illegal conspiracy: denial of Pinehurst's request for a fuel facility other than for Pinehurst's own purposes, Complaint ¶¶ 29, 31, 33; denial of Pinehurst's request for maintenance space, *id.,* ¶¶ 31, 33, 46; complicity in alleged harassment of Pinehurst by Resort, *id.,* ¶ 34; use of deceptive and false representations about the plaintiff to the public and the Federal Aviation Administration, *id.,* ¶¶ 36, 37; delayed consideration of Pinehurst's request for FBO status, *id.,* ¶¶ 38, 41; disparate treatment concerning improvements of property leased by Pinehurst and Resort, *id.,* ¶ 43; and delay of Pinehurst's request for permission to construct a nose dock, *id.,* ¶ 47.

**20.** Those claims are: allegedly higher rent levied on Pinehurst, Complaint, ¶ 32; levy of in-

flated electricity charges, *id.,* ¶ 41; disparate improvement policy, *id.,* ¶ 43; requirement that Pinehurst file a financial statement, *id.,* ¶ 45; and requirement that Pinehurst deal with the airport through Resort, *id.,* ¶ 48.

N.C.G.S. § 63–53(5) provides in pertinent part that a municipality operating an airport has the authority

"To determine the charge or rental for the use of any properties under its control and the charges for any services or accommodations and the terms and conditions under which such properties may be used, *provided that in all cases the public is not deprived of its rightful, equal, and uniform use of such property.*" (Emphasis added.)

**21.** As the Court in *Woolen* so aptly stated, "This opinion does not hold that the present arrangement . . . is illegal; it only holds that it must stand for antitrust inspection." 461 F.Supp. at 1040.

**22.** One commentator has suggested that the appropriate standard of review for such acts is the "rule of reason" standard as enunciated by Mr. Justice Blackmun in *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 609–10, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (Blackmun, J., concurring). *See* Bangasser, *supra* at xxxiii n. 109. This particular question, as well as many others, will have to wait development by the lower courts. Guidance in this area, unfortunately, will have to come for sources other than the parties involved in the *Lafayette* case. That litigation apparently was settled after the Supreme Court remanded the case to the District Court. *See* Note, *supra* at 190 n. 130.

through legislative histories. Whatever the outcome, the Court is confident that the resources available are adequate to meet the challenges that may lie ahead.

### (5) *Private Parties' Exemption*

The Committee and the individual defendants in this case argue that they are improper parties to this action for several reasons. First, they contend that since the Board is immune from antitrust liability, there can be no conspiracy. In view of the disposition of the Board's immunity claim, this position is unpersuasive. Next, they argue that since the Committee had purely advisory powers, it cannot be held liable, nor can its members individually. Plaintiff claims to the contrary and on a motion to dismiss, the only question for the Court to decide is whether there are any facts which the plaintiff could prove that would provide a basis on which relief could be granted. If the plaintiff can prove that the powers of the Committee were not just advisory, and in fact were of a dispositive nature, then the Committee and its members can be held liable for an antitrust violation. For this reason, the motion should be denied insofar as it is based on this argument. Finally, these defendants claim that they should be held immune from any liability as a matter of law under the *Noerr-Pennington* doctrine.[23] That doctrine may not apply to the present context, however, where the effort of the parties in question was not to influence legislation favorable to themselves or detrimental to others, but allegedly was to effectuate a favorable disposition or implementation of

the statutory framework that was already in existence. The First Amendment considerations present in the first situation may not be so compelling in the latter. In addition, even if the doctrine is interpreted to cover attempts to influence favorable administrative treatment, if the plaintiff can show that the defendants here actually controlled the decisions of the Commissioners, then the protection of *Noerr-Pennington* would not be available to them.[24]

Moreover, again assuming the plaintiff can prove the defendants controlled the Board, the exemptions established by *Cantor v. Detroit Edison,* supra, would not apply. That case teaches that the activities of a private party are exempt from the antitrust laws only if such activities are essential to the success of a state regulatory scheme, or they are compelled by the state. *Woolen,* supra at 1032. On the basis of the allegations now before it, the Court concludes that neither exemption has been shown to be applicable.

For the reasons heretofore stated, the Court concludes that the motions to dismiss, insofar as they are based on the arguments discussed in the present section, should be denied.

### (6) *Due Process Allegations*

### (A) *Substantive Rights*

Pinehurst makes the argument that it was denied due process guaranteed by the Fourteenth Amendment by virtue of an alleged lack of adequate standards in N.C. G.S. §§ 63–53(1) and (2). The statute is unconstitutional, it is argued, because it

---

23. This doctrine has been distilled from two Supreme Court cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). It generally protects from antitrust liability persons or entities who attempt "to influence lawmakers *to enact legislation* beneficial to themselves or detrimental to competitors." *Lafayette, supra,* 435 U.S. at 399, 98 S.Ct. at 1129 (emphasis added). This principle holds true regardless of the anticompetitive purpose of those seeking to exert their influence and the anticompetitive effect that their acts create. *Id.,* at n. 17.

24. The Court notes in passing that the decision in *Lafayette* not only sheds new light on this case, but may have serious repercussions for the scope and weight of the *Noerr-Pennington* doctrine as well. At the time those cases were decided there was no question but that the state action doctrine would have protected the Board from charges such as the ones advanced by Pinehurst. The implications of *Lafayette* add an entirely new dimension to municipal liability and indirectly to the liability of private persons or entities that seek to influence public action of a legislative or administrative nature.

fails to set any guidelines by which a municipality can exercise its discretion. The Court disagrees. The statute in pertinent part states that a municipality is authorized, in regard to any airport it might establish, "[t]o adopt and amend all *needful* rules, regulations and ordinances for the management, government and use of any properties under its control . . . ." N.C.G.S. § 63–53(2) (emphasis added). The statute also provides that the municipality may adopt ordinances to safeguard the public against the hazards of aerial navigation, and requires that

> "Such ordinances . . . must conform to and be consistent with the laws of this State and shall be kept in conformity, as nearly as may be, with the then current federal legislation governing aeronautics and the regulations duly promulgated thereunder and rules and standards issued from time to time pursuant thereto."

*Ibid.* Although the standard set out in the statute for the enactment of managerial rules and regulations is limited to the word "needful," the Court is of the opinion that such a standard is sufficiently definite to serve as a reasonable and workable guide to an administrative body, whose activities require flexibility and a practical approach, without leaving that body to its own unfettered discretion. *See Yakus v. United States*, 321 U.S. 414, 427, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

For the same reason, the Court concludes that the standard for municipal action with respect to safety ordinances is definite enough to withstand constitutional scrutiny. The motion to dismiss as to the substantive due process challenge against § 63–53(2) should, therefore, be granted. It should be denied at this time, however, with respect to § 63–53(1).

■ Pinehurst also makes a substantive due process attack on § 63–53(3), claiming that it allows the municipality to deprive a person of his liberty interest. It bases its argument on the North Carolina Supreme Court's decision in *In re Certificate of Need for Aston Park Hospital, Inc.*, 282 N.C. 542,

193 S.E.2d 729 (1973). Pinehurst correctly points out that the holding of that case was that the denial of the right to construct an adequately staffed and equipped hospital except upon issuance of a certificate of need was found to be a denial of due process. 282 N.C. at 550, 193 S.E.2d at 735. The due process denial, however, was based upon Article I, § 19 of the North Carolina Constitution, and not upon the due process clause of the Fourteenth Amendment of the United States Constitution. More importantly, however, the facts of the case are significantly different from the facts of the present case. In *Aston Park*, the North Carolina Medical Care Commission ("Commission"), after a hearing, denied the hospital's request for permission to construct a 200-bed general hospital. The hospital proposed to build the hospital without any public funds and on a tract of land that it owned clear and free of any encumbrances. The issue there was whether the statute which gave the Commission the power to veto such a request exceeded the constitutional power of the legislature. The Court held that it did. 282 N.C. at 547, 193 S.E.2d at 733. The alleged liberty interest that Pinehurst defines is the right to compete at a public airport that is limited in space and facilities. The result in *Aston Park* thus cannot be controlling. Nor is this argument. Taken on its face, plaintiff's argument would deny the Board the right to make day to day operational decisions concerning the Airport. Thus, plaintiff's due process claim that § 63–53(3) is constitutionally infirm on its face is unpersuasive and the motion to dismiss as to this aspect of the complaint should be granted.

■ Nevertheless, under the standard for a motion to dismiss, the Court is constrained to deny the motion in part, for the reason that there are facts which, if proved, would entitle Pinehurst to relief on a due process claim. For instance, Pinehurst might be able to prove that the denial by the Board of its requests to expand its facilities at the airport was based on Pinehurst's refusal to abide by Board demands or practices that are in violation of the

antitrust laws. In that case, the Court could conclude that the denial was not related in a rational manner to the protection of the public safety, health or welfare. For this reason, then, the Court concludes that the motion to dismiss the substantive due process attack on § 63–53(3), should be denied in part.

### (B) *Procedural Rights*

■ The plaintiff's claim in this regard is based on the alleged refusal by the Board, after it had granted Pinehurst the right to construct fuel and maintenance facilities, to allow implementation of the former authorization. Plaintiff charges that the refusal, absent a hearing, denied its rights to procedural due process by depriving it of a property right or interest without a hearing. At this point it is not clear to the Court that there are no facts which the plaintiff could prove that would show Pinehurst was deprived of a property interest or right, and for that reason the motion to dismiss insofar as it is directed to the alleged procedural due process violation should be denied.

### (7) *Equal Protection Claim*

■ To the extent that the federal equal protection challenge of the plaintiff is based on the claim that §§ 63–53(2)(3) and (5) are devoid of appropriate standards, that argument is rejected for the same reasons that the plaintiff's due process challenge to § 63–53(2) was found unpersuasive.[25] The equal protection challenge to § 63–53(1), however, must be allowed to stand.

As for the other allegations set out by plaintiff which complain of disparate treat-ment, the Court is not able to say that there are no facts which the plaintiff could prove which would form the basis for some relief, and for that reason the motion to dismiss must be denied in part.

### (8) *Pendant State Claims*

Counts III through VI of the complaint set out various claims of state law violations;[26] they are based on the same acts which give rise to the alleged federal law violations already discussed.

■ There are no independent grounds enabling the Court to hear these state claims; thus the Court may hear them, if at all, by virtue of the doctrine of pendant jurisdiction. The classic explanation of the doctrine appears in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court stated:

> "Pendant jurisdiction, in the sense of judicial *power*, exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ,' U.S.Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. . . . The state and federal claims must derive from a common nucleus of operative fact."

383 U.S. at 725, 86 S.Ct. at 1139 (footnotes omitted; emphasis in original). It is clear in this case that the state claims derive from the same operative facts as do the federal claims, that the state and federal causes of action comprise but one constitutional "case," and that the federal claims

---

**25.** Subsections (3) and (5) of the statute grant the power to municipalities, respectively, to lease airports or parts thereof to private and public parties, and to charge rent therefor. Both sections contain provisos that in essence require such actions to respect and conform with the public's "rightful, equal and uniform use" of such property. These words clearly set out an adequate standard by which a municipality can adjust and gauge its behavior so as to avoid running afoul of both the due process and equal protection clauses of the United States Constitution.

**26.** Count III alleges violations of Article I, § 34 of the North Carolina Constitution, and of N.C. G.S. § 63–53 (presumably subsection (2) thereof); Count IV alleges violations of N.C.G.S. §§ 75–1, 75–1.1 and 75–5(b); Counts V and VI allege denials of equal protection and due process as guaranteed by the North Carolina Constitution.

have sufficient substance to confer subject matter jurisdiction on the Court. The power to hear the claims therefore exists.

 Even though that power exists, it need not be exercised, for the doctrine of pendant jurisdiction is one of discretion, not of plaintiff's right. *Id.* at 726, 86 S.Ct. 1130. Since the issue of whether pendant jurisdiction has been properly assumed remains open throughout the course of a case, the Court will not engage in an in-depth consideration of the concepts of judicial economy, convenience and fairness to litigants, the necessity of deciding the various questions of state law, potential of confusing a jury, and the like. The Court does note that at this point these requirements do seem to have been met and thus will assume jurisdiction over the various state claims set out in Counts III through VI. Should it appear at a later date that jurisdiction over any of the state claims is no longer proper, the Court will not hesitate to dismiss any such claim.

### (A) *Constitutional Claims*

 Pinehurst argues that the violations of federal law that allegedly occurred were violations as well of Article I § 34 of the North Carolina Constitution. That section states that "perpetuities and monopolies are contrary to the genius of a free state and shall not be allowed." Contrary to the position taken by the defendants, the Court concludes that the motion to dismiss this claim must be denied. There are facts Pinehurst could prove entitling it to relief. The primary jurisdiction and exhaustion of remedies arguments have been rejected; the federal antitrust claims have not been dismissed. Thus, the motion as to the Article I, § 34 claim must be denied.

For the same reasons that the Court set out when it discussed the plaintiff's federal due process and equal protection claims, the court concludes that there are facts which the plaintiff could prove that would entitle it to relief with respect to the state equal protection and due process claims,[27] and the motion to dismiss as to these claims should, therefore, be denied. It should be granted, however, as to the due process and equal protection claims that §§ 63–53(2), (3) and (5) lack adequate standards by which a municipality can measure its conduct, and that Pinehurst's liberty interests were violated.[28]

### (B) *Statutory Claims*

 Pinehurst also asserts violations of N.C.G.S. §§ 75–1, 75–1.1 and 75–5(b). By virtue of the defendant's own argument that the first of those statutory sections is based on Section 1 of the Sherman Act and should be interpreted in a similar manner, the motion should be denied. Moreover, the result in the *Stewart* case does not necessarily control the result in this case.[29]

As to the § 75–1.1 cause of action, the Court cannot conclude at this point that there are no facts which the plaintiff could prove that would entitle it to relief, and for that reason the motions should be denied.[30]

### *Plaintiff's Motion to Consolidate*

 District courts have broad discretion under Fed.Rule Civ.Proc. 42(a) to consolidate causes pending in the same district. *A/S J. Ludwig Mowinckles Rederi v. Tidewater Constr. Corp.*, 559 F.2d 928, 933 (4th Cir. 1977). Here the plaintiff is the same in both actions, common questions of fact and law abound, and a consolidation of the actions should result in a substantial savings of time and effort. On the other hand, it may be quite difficult to draft clear jury instructions as to the time at which the liability of McKenzie, if any, arose, and the

27. Article I, § 19 of the North Carolina Constitution specifically guarantees that "No person shall be denied the equal protection of the laws . . . .." The Court in *Aston Park, supra,* concluded that this section also guaranteed due process of law. 282 N.C. at 550, 193 S.E.2d at 735.

28. *See* Sections I(c)(6) and (7), *supra.*

29. *See* note 13, *supra.*

30. None of the briefs submitted by the defendants addressed the cause of action based on N.C.G.S. § 75–5(b), and the Court assumes that any objection to such cause of action, for the purposes of the motions to dismiss, has been dropped.

amount of damages, if any, for which she is liable. Her presence in the suit filed against Resort, et al., could interject various questions of corporate and agency law into the trial of these cases as well.

The Court concludes, however, that the balance is in favor of the plaintiff in this regard, and that the cases should be consolidated.[31]

*Summary*

For the reasons heretofore stated, the Court concludes that the motions to dismiss, to the extent that they address plaintiff's claims that its federal and state due process and equal protection rights were violated by an alleged lack of standards in N.C.G.S. §§ 63–53(2), (3) and (5), and that its state and federal liberty interest in operating at the Airport was impermissibly infringed, should be granted. Insofar as the motions are based on any other arguments or defenses, however, they should be denied. In addition, the plaintiff's motion to consolidate should be granted.

ORDER

To the extent indicated in the section of this Memorandum Order entitled "Summary," the Court hereby GRANTS in part and DENIES in part the defendants' motions to dismiss. The Court also GRANTS the plaintiff's motion to consolidate.

APPENDIX

The pertinent parts of several North Carolina statutes are reprinted below:

"§ 63–2. *Cities and towns authorized to establish airports.*—The governing body of any city or town in this State is hereby authorized to acquire, establish, construct, own, control, lease, equip, improve, maintain, operate, and regulate airports or landing fields for the use of airplanes and other aircraft, either within or without the limits of such cities and towns and may use for such purpose or purposes any property suitable therefor that is now or may at any time hereafter be owned or controlled by such city or town."

"§ 63–3. *Counties authorized to establish airports.*—The governing body of any county in this State is hereby authorized to acquire, establish, construct, own, control, lease, equip, improve, maintain, operate, and regulate airports or landing fields for the use of airplanes and other aircraft within or without the limits of such counties, and may use for such purpose or purposes any property suitable therefor that is now or may at any time hereafter be owned or controlled by such county."

"§ 63–5. *Airport declared public purpose; eminent domain.*—Any lands acquired, owned, controlled, or occupied by such cities, towns, and/or counties, for the purposes enumerated in G.S. 63–2, 63–3 and 63–4, shall and are hereby declared to be acquired, owned, controlled and occupied for a public purpose, and such cities, towns and/or counties shall have the right to acquire property for such purpose or purposes under the power of eminent domain as and for a public purpose."

"§ 63–53. *Specific powers of municipalities operating airports.*—In addition to the general powers in this Article conferred, and without limitation thereof, a municipality which has established or may hereafter establish airports, restricted landing areas or other air navigation facilities, or which has acquired or set apart or may hereafter acquire or set apart real property for such purpose or purposes is hereby authorized:

"(1) To vest authority for the construction, enlargement, improvement, maintenance, equipment, operation and regulation thereof in an officer, a board or body of such municipality by ordinance or resolution which shall pre-

---

**31.** Under Fed.Rule Civ.Proc. 42(b), the Court has the discretion to sever the cases for trial should the defendant's contentions of prejudice and confusion later appear more persuasive than they do at the present time. If they do, the Court will not hesitate to order the cases severed.

scribe the powers and duties of such officer, board or body. The expense of such construction, enlargement, improvement, maintenance, equipment, operation and regulation shall be a responsibility of the municipality.

"(2) To adopt and amend all needful rules, regulations and ordinances for the management, government and use of any properties under its control whether within or without the territorial limits of the municipality; to appoint airport guards or police with full police powers; to fix by ordinance, penalties for the violation of said ordinances and enforce said penalties in the same manner in which penalties prescribed by other ordinances of the municipality are enforced. It may also adopt ordinances designed to safeguard the public upon or beyond the limits of private airports or landing strips within such municipality or its police jurisdiction against the perils and hazards of instrumentalities used in aerial navigation. Such ordinances shall be published as provided by general law or the charter of the municipality for the publication of similar ordinances. They must conform to and be consistent with the laws of this State and shall be kept in conformity, as nearly as may be, with the then current federal legislation governing aeronautics and the regulations duly promulgated thereunder and rules and standards issued from time to time pursuant thereto.

"(3) To lease such airports or other air navigation facilities, or real property acquired or set apart for airport purposes, to private parties, to any municipal or State government or to the national government, or to any department of either thereof for operation; to lease to private parties, to any municipal or State government or to the national government, or any department of either thereof, for operation or use consistent with the purpose of this Article, space, area, improvements, or equipment on such airports; to sell any part of such airports, other air naviga-

tion facilities or real property to any municipal government, or to the United States or to any department or instrumentality thereof, for aeronautical purposes or purposes incidental thereto, and to confer the privileges of concessions of supplying upon its airports goods, commodities, things, services and facilities; provided that in each case in so doing the public is not deprived of its rightful, equal, and uniform use thereof.

\* \* \* \* \* \*

"(5) To determine the charge or rental for the use of any properties under its control and the charges for any services or accommodations and the terms and conditions under which such properties may be used, provided that in all cases the public is not deprived of its rightful, equal, and uniform use of such property. Charges shall be reasonable and uniform for the same class of service and established with due regard to the property and improvements used and the expense of operation to the municipality. The municipality shall have and may enforce liens as provided by law for liens and enforcement thereof, for repairs to or improvement or storage or care of any personal property, to enforce the payment of any such charges.